# WEIL, Trustee, and others v. CALHOUN, as Ordinary, and another.[1]

*(Circuit Court, N. D. Georgia.* December 16, 1885.)

1. CIRCUIT COURT—JURISDICTION—CITIZENSHIP.
The fact that one of several parties plaintiff is a citizen and resident in another state does not give this court jurisdiction of a bill filed against a citizen and resident of Georgia.

2. SAME—FEDERAL QUESTION.
A charge in a bill that a certain act of the legislature of Georgia was about to be declared of force, by reason of a popular vote of the county of Fulton, in pursuance of the statute, which statute prohibited the sale of intoxicating liquors in the counties adopting it; and that some of the plaintiffs were large liquor dealers and dealers in foreign wines and wines of other states, and had large stocks on hand, and had license and good-will, which in the liquor business is of large value; and that another plaintiff was interested in a chartered brewery, authorized by its charter to make and sell beer; and that the putting and declaring such law of force would materially damage their business, impair thus the contract in the brewery charter, and interfere with their right to sell liquors in the adjoining states; and charging also that the act of the legislature, while it prohibited, if sustained by a popular vote, the sale of spirituous liquors generally, yet contained a proviso exempting domestic wines from the operation of the act,—presents a federal question, under the act of congress of 1875, and the circuit court of the United States have jurisdiction to hear and determine such federal questions.

3. INJUNCTIONS—STAY OF PROCEEDINGS IN STATE COURT.
The act of congress (section 721 of the Revised Statutes) prohibiting the courts of the United States from granting injunctions to stay proceedings in any court of a state, etc., does not cover the case of a bill filed praying an injunction against the ordinary of a county, who, in addition to his ordinary duties as a probate judge. is clothed by a special statute with the duty of counting the votes and examining the returns of a county election on a local option law, and declaring the result.

4. CONSTITUTIONAL LAW—STATE LOCAL OPTION LAW EXEMPTING FROM ITS PROVISIONS DOMESTIC WINES.
The act of the legislature of Georgia known as the "Local Option Law," exempts from its provisions domestic wines, though it prohibits the sale of spirituous liquors, including wines. *Held,* that it is not competent for a legislature of a state thus to discriminate between wines made in Georgia and the wines of other states and foreign wines.

5. SAME—ACT VOID IN PART.
Whether this clause—this discrimination—makes the whole act void, the court does not expressly decide, but inclines to the opinion that the proviso making the exemption is void, and the whole act good.[2]

6. SAME—CONSTITUTIONALITY OF LOCAL OPTION LAWS.
It is competent for the legislature of Georgia to pass a law to take effect only on the happening of a certain event; and an act prohibiting the sale of spirituous liquors in the state, excepting certain counties from the operation of the act, and providing that the law should only go into effect in any county after the people, by a popular vote, had so decided, is within the legislative discretion, and is not delegating the powers of the legislature to the people of the counties.

7. ELECTION—USE OF THREE BOXES AT POLLING PLACES.
At an election in Atlanta, Georgia, it was evident that there were not sufficient polling places in two of the militia districts composing the city of Atlanta for the people to vote at a certain election, and the managers and the ordinary and other county officers, on the advice of many citizens of both parties, adopted a scheme to facilitate the voting, by having at each polling

[1] Reported by Walter B. Hill, Esq., of the Macon bar.

[2] See State v. Stucker, (Iowa,) 2 N. W. Rep. 483; Marshalltown City v. Bloom, (Iowa), 12 N. W. Rep. 266; Webber v. Virginia, 103 U. S. 344; Word v. Maryland, 12 Wall. 418; Walton v. Murrain, 91 U. S. 275.

place three boxes, some 10 or 20 feet apart, and so related to each other as that one manager stood at each box and gave that his special attention, though all joined in the settlement of any questions made, and all were in sight and within a few feet of each box. *Held,* that while it was very doubtful if this proceeding was legal, yet it did not make the election void, unless it were also made to appear that the result would have been different had no such irregularity existed.

8. SAME—INJUNCTION TO RESTRAIN ELECTION OFFICERS.

Election managers and persons clothed by law with the duty of receiving the returns of an election, counting and canvassing the votes, and declaring the result, especially with specific power to hear and determine all questions arising, will not be interfered with by an injunction in the performance of their duties.

9. SAME—REMEDY AT LAW.

In this case the plaintiffs have a complete and adequate remedy at law, by contest before the ordinary, or, if not satisfied with the result of such a contest, then by a contest before the superior court, as provided by the local option law.

10. SAME—LOCAL OPTION LAW.

The local option law does not disqualify those sections of the counties having local laws prohibiting the sale of liquor from voting in a county election to determine if the local option law shall go into operation in the county in which such localities are situated.

11. SAME—REGISTRATION LAW.

A registration law directing the books to be closed 10 days before the election, and making no provision for the registration or voting of persons becoming qualified to vote after the closing of the books, and before the election, is not void, so as to render the election void, especially if it do not appear that the result would have been different if a provision had been made for such voters.[1]

12. CONSTITUTIONAL LAW — POLICE POWER OF STATE — LOCAL OPTION LAWS— RIGHTS OF CITIZENS OF OTHER STATES—BILL IN NAME OF ATTORNEY GENERAL.

When a bill was filed by various liquor-dealers charging that their property and contracts and vested rights were about to be seriously damaged by the going into operation of a law to prohibit the sale of liquor, *held,* that such act, so affecting private rights, was under the police power of the state. *Held, further,* that as the injury claimed was one common to the larger portion of the community, that one or more of a special class could not file a bill to redress the wrong. The bill must be in the name of the attorney general, who will make the complainants parties, and sue in the name of the state.

Bill for Injunction, etc.

*Ale C. King, John T. Glenn, Cox & Cox, Henry B. Tompkins, Julius L. Brown,* and *W. A. Hawkins,* for complainants.

*Mynatt & Howell, T. P. Westmoreland, Hall & Hammond, Haygood & Martin,* and *Milledge & Smith,* for defendants.

McCAY, J. This bill is filed by three parties: (1) Mr. Weil, as trustee for certain persons holding stock in the brewery, which persons are citizens of the state of Tennessee; (2) Paul Jones, a dealer, among other things, in foreign wines and liquors; (3) by Cox, Hill & Thompson, dealers in wines made in other states, and in spirituous liquors generally, by wholesale.

The bill sets out that at the last legislature of Georgia a bill was passed providing for the prohibition of the sale of spirituous liquors in the various counties of the state in which there were not already prohibitory laws. The act provides that it shall only take effect in counties where the people, by a popular vote, shall so determine. The

[1] See Daggett v. Hudson, (Ohio,) 3 N. E. Rep. 538.

bill sets out that an election, under the law, has lately been held in Fulton county; that the prohibition vote was the largest, by —— majority; and that the ordinary is about to and threatens to declare the result. The object and prayer of the bill is to seek the intervention of a court of equity to enjoin the ordinary from so doing, and to ask that, until a final hearing can be had, the chancellor shall grant a temporary injunction to restrain him. The jurisdiction of the circuit court of the United States is invoked, (1) on the ground that some of the parties are citizens of the state of Tennessee, and they charge that they appear as stockholders, and not in the name of the corporation, which is a Georgia corporation, because the corporation refuses to act, and they make it a party defendant to the bill; that Cox, Hill & Thompson are dealers in wines made in other states, and that Paul Jones is a dealer in foreign wines and other liquors, and each have, and had at the date of the act, large stocks on hand. Besides this allegation of the citizenship of these Tennessee people, the bill alleges, as another ground for appeal to a federal tribunal, that the act providing for the election is in several respects in violation of the constitution of the United States; that it destroys their vested rights, in that it impairs the obligation of the contract in the charter of the brewery company; that it attempts to regulate commerce between the state and foreign states; and that it discriminates between domestic wines, and those of other states, and the wines imported from abroad, by prohibiting the sale of these two latter wines, while it expressly exempts domestic wines from the operation of the act. This latter, as I understand it, is the principal ground on which the plaintiffs insist there is a federal question involved, and that this court has, therefore, jurisdiction of the controversy. The bill alleges that the necessary and inevitable effect of the law, if it be declared of force, will be to make wholly worthless the stock, fixtures, etc., of the brewery, and seriously to interfere with the property, business, and vested interests of the complainants.

The bill charges that the law was not published as the Code requires; that the registration was ordered before the election was proclaimed; that the registration act made no provision for the registry of persons who, though not entitled to vote when the books were closed, yet became so during the 10 days intervening after the closing of the books and the registration; that persons living in the corporate town of West End were permitted to register and vote, and persons residing in various other localities in the county were so allowed, and that in West End and other localities prohibition was already established, and by the statute no election could be held in such localities; that one or two registrars were not freeholders, as the statute requires; and that at the two voting precincts in Atlanta, on the idea that there was not sufficient opportunity for all the voters to cast their ballots during the legal hours, three separate boxes and voting lists had been placed at each poll, the voters required to come up and vote according to a plan based on the first letters of their surnames, and

that under the plan only one manager could properly and practically preside at one box, they being at least 10 feet apart.

Various affidavits have been filed, to-wit: Ordinary Calhoun's, denying that he had fixed any day for declaring the result; denying the alleged defect in the advertisement of the election; insisting that all the registrars were freeholders; and asserting that he had expressed no opinion as to how he would decide the questions made on the returns, and that he had notified both parties that he was ready to hear any objections and arguments upon them; and, as to the illegal boxes, saying that the boxes at the two city precincts were resorted to at the request of a meeting of citizens of both parties, and were intended to facilitate the casting of the ballots, and did in fact do so in a very decided degree, and that the three managers were so situated as that they all might and generally did inspect and pass upon any question that arose within the sphere of their duties. Affidavits were filed by the plaintiffs, qualifying the statements of the ordinary as to what he said about when he would declare the result, and as to what he would do, but not materially denying his statements on the subject. Also an affidavit explaining their motives for charging that two of the registrars were not freeholders; also Spalding's and Flesch's and other affidavits of managers and others, attacking the arrangements at the polls, and stating that it was not possible, under those arrangements, for each of the managers to supervise and pass upon each voter.

The defendant insists that the bill makes no case justifying the granting of the prayer, because no such parties or questions are made as to authorize the interference of a federal court, under the constitution and laws of the United States; that the registration as provided by law, and as actually carried out, was no infringement of any rights of any one, and that whatever objections there might be to the arrangements at the polls, as to the boxes, mode of voting, etc., and the capacity of the managers to oversee the voting, the election is still not illegal, but is good, unless it is made affirmatively to appear that had these irregularities not existed, the result would have been different; that the clause in the act as to localities where prohibition already existed by law did not render the voters in the locality referred to disqualified voters in the county elections; that, under the police power of the states, it was competent for the legislature to pass the law objected to, notwithstanding it may affect the property of the complainants, as insisted on in the bill; that it was competent for the legislature to pass the law, and make its going into effect in any county dependent on a popular vote; that, however the clause exempting domestic wines from the operation of the act might be, unconstitutional and void, yet it was possible, this being a mere proviso or exception to a general clause covering all wines, to reject the proviso, and leave the general clause stand; that defendant was a state court, and the act of congress (section 720 of Revised Statutes) prohibited a United States judge granting an injunction to restrain a

court of any state; that if not a court, the ordinary is still an officer, clothed by the laws with certain duties requiring judgment and discretion, and is for that reason exempt from the writ of injunction from any court.

In view of the importance of this case, the interests involved, and the intense feeling existing in the questions made, I have allowed the most extended and elaborate discussion of this matter. Nearly four days, of five hours each, have been devoted to the argument, and I have given it the very best consideration I am able to do. Though a public question, I have taken no part in the contest before the people, did not vote at the election, and have much regretted, and as a private citizen disapproved, of many of the methods pursued by both parties in the contest before the people.

There is no more delicate duty a court is ever called upon to perform than to interfere with the legislative department of the government. Each is a constituent element of the body politic, each has its prescribed duties, and each is independent of the other in the performance of those duties. From the very nature of the case, however, it often happens that the judiciary branch is called to pass upon the legality and constitutionality of the acts of the other departments, —not that it is, in any sense, superior to them or a supervisor of them; not that it is, as is sometimes said, the expounder of the constitution, and therefore paramount in such matters over the other branches. The source, and the sole source, of the right of the judiciary thus to interfere is entirely collateral and incidental, and grows out of the necessities of the case, to-wit, the obligation always resting on a court to choose and decide between conflicting laws. When private rights are before a court—any court—for adjudication, and two conflicting laws are appealed to, the court must, from the very necessities of the case, decide which of those laws is to be obeyed and enforced by it. If one of them is the constitution, and the other an act of the legislature, and they are in conflict, the court must choose between them, and obey and enforce the one which, by the nature of the government, is of the highest dignity, to-wit, the constitution, the will of the people, expressed in the form of the fundamental law, to which all departments are bound to conform, and in conflict with which no act, even of the legislature, is of any validity. As I have said, every court, even the humblest, even a magistrate's court, called upon to decide private rights, is driven, by the most imperious necessity, to decide the law controlling the controversies coming before it; and in case of two laws being in conflict, it must, under its oath of office, obey and enforce the highest. This duty, as I have said, is not direct, but collateral and incidental, and forced upon the judiciary department by the necessity of the case, to-wit, the presence and the pressure upon it of two conflicting laws. The result is that, to determine the question before it, a grave duty sometimes presents itself to every court,—of declaring even acts of the legislature in con-

flict with the constitution, and consequently void and of no effect. This, as is apparent from a moment's consideration, is a most delicate duty,—one only to be undertaken when absolutely necessary. When driven to exercise it, a court is always cautious and hesitating. All presumptions are in favor of the validity of the legislative act; all doubts are to be resolved in support of it; and only in clear and decided cases, calling imperatively for it, should a court undertake to declare an act of the legislature void. The duty is a burdensome and ungracious one, and the matter is to be considered with care and cautiousness, and to be decided only after the most serious deliberation, the court always keeping in sight the source of its power, —to-wit, the necessity to adjudicate private rights,—and always remembering that the legislature is an independent and co-ordinate branch of the government, and not a subordinate or inferior one.

I have made these remarks because I fear the subject is misunderstood. Men, and sometimes courts, talk flippantly and lightly upon it, or assume too much or too little for the judiciary. I have myself the greatest respect for the legislature, not only because it is my duty, but because, in the course of a long life, I have generally found it right. Composed, as these bodies are, of many persons, taking time for deliberation and discussion, and acting, as a matter of course, with a full sense of their paramount obligations to the constitutions of the state and the United States, I have usually found them right, and to have kept within their constitutional sphere. I repeat what I have said, that the judiciary has no direct power to control the action of the law-making power. Its jurisdiction arises incidentally and collaterally, and only when it is called upon to pass upon some private controversy or private right, and one of the parties relies upon some law which the other insists is unconstitutional. In such a case the judiciary must obey and enforce the higher law, to-wit, the constitution.

The first question I am to decide is that of the jurisdiction of this court, and whether it is prohibited, in cases like this, from acting at all by section 720 of the Revised Statutes.

Whatever may be the *status* of this case on the subject of jurisdiction, by reason of the residence of some of the parties in Tennessee, (though I doubt if the fact of one of them, or one set of them, residing in another state is sufficient,) yet it is certainly true that the charges in the bill do make a federal question, since the whole *gravamen* of the case is the charge that the complainants are about to be deprived of important property rights by the attempt of the defendant to declare in operation a pretended law which is charged to be in violation of the constitution of the United States in two or three of the provisions of that constitution.

Under the act of 1875, the circuit courts are, in express terms, declared to have jurisdiction in all cases over $500, where a right is claimed under the constitution and laws of the United States. It is

said that under section 720 of the Revised Statutes this court cannot grant the prayer of this bill, because the ordinary is a state court, and that section prohibits any federal court from enjoining a court of any of the states, under any circumstances. I do not think the ordinary, in the performance of the duties provided by this act of 1885 of the Georgia legislature, is a court, in the sense of that section. The universal practice of the states is to have some branch of the executive department to determine the results of an election. Indeed, all officers performing such duties are part of the executive department, and yet in all the states the rule is imperative that the executive and judicial departments should be kept distinct. Whether officers of this kind are not exempt from the process of injunction, on the ground that though not courts or judicial officers, yet because they have duties to perform requiring discretion and judgment, the courts, by injunction, will not interfere with that performance, is another question which I will discuss further on in this opinion. Having, as I think, for this reason, jurisdiction of this case, I proceed to decide the questions made and argued so ably and exhaustively before me.

I am inclined to the opinion that the fact the registration law makes no provision for the registration of those who become competent to vote after the registration is closed, and before the election, does not vitiate the registration. If the period between the registration and election be brief, and only such as is proper for making out and putting in proper shape the registration papers, it seems to me that both reason and authority sanction such registration laws. The authorities are in conflict; but, in my judgment, sound sense and a due regard to the true interest of the state should lead a court to sustain such laws as strike but a prelude and preparation for the election and a part of its machinery, even though some days intervene between the close of the registration and the actual opening of the polls. It is self-evident that some time must be taken for making out the returns of the registration and putting them in shape for use at the polls, and whether this shall be one hour, or one, two, or ten days, would seem to depend on the legislative will, and, if not grossly excessive, ought to be sustained. Besides, it seems to me that such objections to the registration ought, for reasons of public policy, to conform to the rules applicable to objections to elections not held in strict conformity to law, to-wit: It should be made affirmatively to appear that the result would have been different had the illegality not existed. Perhaps the voter might have private redress for the wrong done him in refusing his vote, but that is a very different thing from making an election void on a mere abstraction not affecting the result.

It seems to me clear that it was not the intent of the local option act to deprive voters who resided in localities within a county where prohibition has been provided for by a special enactment, of the right to vote in a county election under this statute. Laws are to have a reasonable interpretation; the whole act is to be taken together, and

its scope and intent considered in coming to a proper conclusion upon its meaning. This law evidently, in its passage through the legislature, originally contemplated that this local option might be submitted to cities, towns, and other localities,—perhaps militia districts. It was amended by confining its operation to counties, and the language on which much stress is laid, "cities and localities," was left in the bill, with the idea that, though a county might vote "wet," as they call it, the local laws should not be affected by such vote. There is no reason why these localities, where the sale of liquor is prohibited by some local law of limited range, should be deprived of the right to take part in deciding what shall be the policy of the county on this subject, in which they have precisely the same interest as other citizens of the county.

The great complaint of this bill is that by this law the complainants are deprived of their property, and injured in their business, etc. Nothing is better settled, by a large number of decisions of the supreme court of the United States, than that such losses and such damages are not a good objection to a law. The states must have power to legislate for purposes of good order, the preservation of the public health, and a thousand other objects, and it is an every-day event that some man's property is made less valuable — perhaps worthless—by the operation of laws passed by the legislature for the public good. Professions in which men make money, and devote their whole time, are declared illegal, and are broken up and destroyed, very much to the hurt and pecuniary loss of the persons concerned, and they have no redress. I allude now to the profession of the gambler. So, too, so vastly profitable a business as a lottery, even though protected by a legislative grant, has been broken up by a law prohibiting its exercise, and its property and business dissipated to the winds without any remedy. So, of the oleomargarine manufactory; and so of a hundred different investments, made under laws not prohibiting them, yet rendered valueless or far less valuable by means of the operation of laws passed by the legislature for the public good, as it supposed. This whole subject of the liquor traffic and investments precisely like those of the complainants broken up or largely crippled by prohibitory laws, has been a fruitful source of discussion before the courts, and they are all now agreed that such rights and properties as the complainants assert they are about to have injured or destroyed if this law be declared of force are not protected by the constitution of the United States. *Passenger Cases,* 7 How. 504; *Beer Co.* v. *Massachusetts,* 97 U. S. 25; *Slaughter-house Cases,* 16 Wall. 129; *Stone* v. *Mississippi,* 101 U. S. 814. This question has been before the supreme court of the United States, the court of the last resort in cases of this kind, and that court uniformly and clearly held that rights of the character here set up must yield, however costly and devastating may be the evil, to the will of the legislature in its passage of laws in their judgment for the public good. It is

one of the risks that every man takes in entering a business or making an investment, and he cannot complain.

That it was competent for the legislature to pass this law, and make it operative in any county, accordingly as the people might vote, is now so well settled as not to admit of serious discussion. My own views are stated in the *Brunswick City Case*, 54 Ga. 317.

I do not doubt but that there is one of the provisions of this bill in violation of the constitution of the United States, to-wit: that provision which, while it provides for the prohibition of the sale of all intoxicating liquors of every kind, exempts, by a provision in another section, domestic wines from the operation of the act. This it was not competent for the legislature to do. Commerce between the states is, by the constitution of the United States, under the control of congress, and citizens of each state have all the rights of citizens in other states. I am not at all clear that this discrimination in favor of domestic wines does not render null and void this whole bill. It is true, there are many cases where an unconstitutional clause has been decided not to affect the other portions of the act, if such clause be independent, and capable of being stricken from the act without affecting the general scope of the law. *Tiernan* v. *Rinker*, 102 U. S. 123; *Warren* v. *City of Charlestown*, 2 Gray, 88, 89.

I do not think, however, the test insisted upon by the complainants is the proper one. The Texas case decided by the supreme court had precisely the objection to the law that is made here, and the supreme court held that the discrimination was unconstitutional, but they declared that the void clause did not affect the rest of the act.

So, too, in Georgia, our court held, in deciding upon the act to regulate the practice in the supreme court, that the clause directing certain classes of cases to be continued until the next term of the court was void, as in conflict with the constitution of the state, which prohibited continuances in the supreme court, except for providential causes. Yet that court did not intimate that the rest of the act was void, and, as every lawyer knows, that act has ever since, except this obnoxious clause, been the principal act enforced by the court for regulating the practice. Now, if the test is, as contended for by Mr. Glenn and Hawkins & Cox, that if we may fairly express doubt if the act would have been passed, or the people have voted for it at the election, with this obnoxious clause out, then the whole act is void. If this be the test, why does it not make void the whole act in the Texas case, and the act passed upon by our court in Georgia. May we not say that it is possible the Texas act would not have passed the legislature with the obnoxious clause left out? Who shall say that the Georgia legislature would have passed the act regulating the practice in the supreme court had the clause providing for continuances of certain cases to the next term been left out? The test suggested is inconsistent with these cases, and cannot be the true test. You cannot imagine what the legislature might or might not

do. The proper test is to examine the law as it passed. See to its scope and general object, and then inquire if the scope, aim, and general design of the act may or may not still be enforced, with the obnoxious clause left out. Is the language so broad as that the bad provision cannot be pruned away, leaving the tree still unhurt, and still spreading its essential branches over the land it is designed to shade? This act is entitled "An act to prohibit the sale of spirituous liquors." The general clause makes it illegal to sell *any* intoxicating liquors, no matter where made, if the people vote that way,—to-wit, dry, dry it is,—not even Champagne, or Monopole, not even Longworth or Cincinnati, or the wine grown on the Pacific, or the Georgia wine from the mountains or the midlands or in the rich south-west,— by this section they are all put under ban. The proviso is a separate section,—an excrescence on the bill,—contrary to its whole scope, aad making the whole bill almost a farce. What would prohibition be worth with a domestic wine-shop on every corner? The proviso exempting domestic wines ought never to have been in the bill if its avowed purpose was ever to be carried out. A man is just as drunk, just as much a brute, just as much a worthless excrescence, who is drunk on domestic wines as though he got drunk on brandy or Champagne. It is possible, as I think, to separate this obnoxious clause— protecting domestic wines from the operation of the act—from the rest of it; declare it void, and let the broad prohibition clause have its full effect. I am not, however, as clear on this branch of the subject as I would like to be. The subject is a new one, the authorities rare, and one fears to trust his own judgment in coming to positive conclusions with so little to guide him. I only say this: that I am inclined to hold as I before have indicated.

The arrangement of the boxes at the polls in the two city precincts was unusual, and of very doubtful legality. Indeed, I am compelled to say that I do not think it was legal, and could have been made, in the peculiar constitution of our voting population, a tremendous engine for fraud. But it was adopted at the request of leading men of both parties, and was to meet a difficulty that presented itself to every man. How were 4,000 people to vote? Anybody who knows anything of elections could see at a glance that whatever might be calculated to be done in a minute, that many people, with all the accidents, incidents, and delays inevitable on such occasions, *could not* vote in the time allowed by law. By the arrangement to which objection is made it appears that in fact about 4,000 did vote,—a most extraordinary and unprecedented result. It appears by the affidavits that great order was preserved, and it does not appear that a single voter was seriously delayed or hindered in casting his ballot. True, it is plain to me that the managers could not, under the circumstances, fully perform their duty,—to-wit, to see and judge, in the manner usually practiced, of the propriety of receiving each vote,— and I am not prepared to assert that this arrangement was legal or

ought to be repeated. It is to be hoped that the proper authorities will see to it that this gross scandal be prevented in the future. All experience indicates that not more than 1,000 voters ought to be required to vote at one polling place, and any state of things which requires more is an interference with the freedom of the ballot that ought not to be tolerated for a day. As I have said, I do not consider this arrangement of the ballot-boxes to have been legal. But I do not think that illegality affects the election unless it were made to appear that the result would have been different if no such illegality had occurred. Such is the settled rule; such is the Code of Georgia. If the election be held at the proper time and place, and by the proper officers, the election must stand unless it is made to appear that the result would have been otherwise had the thing complained of not existed. Here the complaint is that such arrangements were made as that the managers could not do their full duty. That is all. The proper men were there, but they mismanaged the matter. Code Ga. § 1334.

The ordinary, though not a court, in its technical sense, is yet an officer clothed by law with certain functions of examination, decision, and discretion. Now, it is admitted that a purely ministerial officer may be enjoined. But I do not think a single case has been read or can be found where an officer or body having such duties as are cast on the ordinary, under this law, has been enjoined. He is to count the votes, and declare the result, and to *decide all* questions that may arise. The cases decided by the supreme court of the United States, of the registrar of the land-office, the commissioner of pensions, secretary of the navy, and like cases, are not nearly so strong as this. *Converse* v. *U. S.*, 21 How. 479; *Gaines* v. *Thompson*, 7 Wall. 347; *Litchfield* v. *Register*, 9 Wall. 575; *Decatur* v. *Paulding*, 14 Pet. 497; *Case of Public Printer*, 7 How. 798. See Cooley, Const. Lim. (5th Ed.) 782.

The writ of injunction is an extraordinary writ, and there are many limitations to its exercise. It will not issue to restrain the enforcement of a purely criminal law. It will not issue to restrain an officer or body whose duty it is to exercise his judgment or discretion. Above all, it is a writ which is only appealed to as a last resort; the party applying must show that he has no adequate remedy at law. Equity only comes in when the law, by its defective and old-fashioned, stiff methods of procedure, fails; and it is an every-day act of all our courts to decide that though the complainant has been grievously wronged, and has the most important interests endangered, yet, by reason of the settled rules limiting the granting of injunctions, they will not interfere. One of these rules is, plaintiff must show that his rights are in danger. There must be no guess-work or hearsay; he. must state facts, capable of legal proof, on which to base his case.

What is the case here? How do the complainants know what was. the result of the election or how the ordinary will decide. He denies

by his affidavit that he has told them, and their affidavits do not really controvert his.  The returns of the election were turned over to the ordinary.  They may be and probably are yet sealed up; their contents can only be known by rumor, or newspaper report.  True, the bill states that the majority at the election was for prohibition.  But it is impossible anybody shall know it except from rumor and report, and the charge in the bill must necessarily have that limitation.  It may be—it probably is—true; but that is not sufficient.  Hearsay rumor is not enough.  Even an oath of a fact to the best of the complainant's knowledge and belief is not sufficient.  The results of granting an injunction are often so tremendous that the strictest rules have been adopted, based on long experience, and requiring certainty and definiteness in the allegations, so that the court may rest satisfied that it is not striking in the dark, but is dealing with stern facts, capable of proof; and that, by legal evidence, and not by hearsay, or the report or statements of anybody.  The complainants say prohibition has carried.  How can they know this?  Only from rumor and hearsay.  They do not produce nor have they probably seen the returns of the managers.  The law places them in the custody of the ordinary.  An outsider cannot even inspect them at will.  The results of an election can never be known, so as to justify an injunction on the ground that a pretended result has taken place, until the vote has been counted by the persons appointed by law to open, count, and declare the result.  Until then the result is mere rumor.  It may be correct; it may not.,

Who knows what the ordinary may do?  Who knows that he may not hold that West End, and other parts of the county to which they refer in their bill as having no right to vote, had in fact no right, and refuse to count any such vote.  If they are right,—if that is the law, —and these localities had no right to vote, surely the presumption is the ordinary will so hold and so declare.  What American who lived at the time Mr. Hayes was declared by congress to have been elected president can fail to appreciate the pertinency of this view of the subject.  Who was the president?  The newspapers differed; this man said this, and that man that.  Even congress was driven to the extraordinary course of selecting a commission, and though a legal result was finally reached, thousands of men still think and assert that Tilden was elected.  Who does not remember the doubts and uncertainties of the result of the vote for president in the state of New York at the last election?  For more than a week the scales hung trembling in the balance; sometimes striking the beam on one side, and again on the other, as new developments and corrections of returns were announced.  How the newspapers and other politicians differed; one side asserting, with the strongest protestations, that they were successful, and the other with just as much positiveness directly the contrary!  At last the persons appointed by law to count the vote performed their duty, and Mr. Cleveland became president by reason

of having received only about 1,200 more votes in the state of New York than Mr. Blaine. The gravest doubts existed as to the result; the most tremendous consequences depended upon it. The presidency of the United States, the exercise of the executive franchise of the nation, the possession of the patronage and the control of the whole machinery of the government of 50,000,000 of people hung in uncertainty, and depended upon the counting and canvassing of the returns of the counties of the state of New York. The canvassers for that purpose met; performed their duty; and though the result depended upon how five or six hundred persons had voted, 50,000,000 of people quietly acquiesced in the result, and not a question has been raised as to its legality,—a consequence, not only strikingly illustrating this point, but also exhibiting, in strong colors, the capacity of our people for self-government, and how this mighty democracy of free voters can quickly settle, through the properly constituted channels, disputes which in the governments of the old world would almost inevitably lead to anarchy and civil war.

I am asked to consider counted these votes, to treat the result as ascertained, and for that reason enjoin the ordinary from counting and ascertaining it. The plaintiffs are in no danger of any of the evils they fear, unless the result be against them, and a statement to that effect is a *sine qua non* to their case. To get at this knowledge the votes must have been counted, and yet the object of the bill is to prevent a count. To make out their case it must appear that the result of the election is so and so, and yet their bill is filed to prevent and stop the very thing they assert. The counting and declaring of 7,000 votes is not by any means a mere formal and ministerial matter. There are always faulty votes; sometimes votes which ought not to be counted; sometimes there are votes about the propriety of counting which there is great doubt. Under our law, especially, the canvasser is invested with very important duties. He may examine the list of voters, investigate legality of each vote, and if he be satisfied of its illegality he may refuse to count it. He may look into the local manager's returns; all experience shows that they are often seriously defective,—sometimes they are not even signed, sometimes they are so grossly informal as to leave even the most liberal mind in doubt as to what ought to be done with them. It is the practice in some states, notably in New York, to return them to the local managers for correction. All this has to be examined into by the canvasser. We have in the history of the state of Maine a striking instance of the wide range open to the judgment of the canvassers. By a system of technical objections the canvassers in that state actually changed the result of the election; not, perhaps, fraudulently, but by the application of close critical rules as to the spelling, etc., they disposed of votes enough to change the result, casting out, perhaps, over 1,000 votes. Anybody familiar with election returns will understand this. They are made out in a hurry, late in the night, often by quite un-

educated men, and men grossly unfamiliar with figures; and the very wisest and coolest and fairest canvasser is often in great doubt whether the return ought to be received and counted or not.

What am I called on to act here? On the next day after the election the newspapers and the *quid nuncs* get from Tom, Dick, and Harry, who may not have even seen the returns, a statement of the result in the local precincts; and with perfect honesty, so far as their interests and partisan prejudices will permit, they so report them, and the public accepts their report as most probably true. But at last it is only hearsay, and more than all, these returns and the votes have not passed the scrutiny required by law of the canvasser,—to-wit, the county managers or secretary of state or governor, or, as in this case, the ordinary,—and it cannot be known until this has taken place what returns are to be acted upon, or what votes are to be counted. Is a statement of fact so loose and unsubstantial, so liable to error and mistake, and above all so liable when the tests of the canvasser have yet to be applied, and the result perhaps changed very materially, to be accepted by a court of equity as reliable, which, in this matter, always requires certainty before it puts its powerful and invasive hand into the matter by injunction? It seems to me not; and this is perhaps the reason, if no other exists, why, in the reports of some 40 or 50 courts in these states, running now for nearly 100 years, there is not to be found a single case where this has been done; and that, too, where elections are so frequent as to justify the remark of a foreign traveler that Americans may well be described as an election-holding people. They are always at it; the ballot-box always at work; the canvass never at rest. I cannot act on such a statement as this, and grant an injunction upon it.

Besides that, I think the remedy at law is complete and adequate, and the appeal to the chancery side of the court—to the one-man power; to affidavits taken in the dark, with nobody present to cross-examine the witnesses—is not allowable. Every question made in this bill may be made before the statutory tribunal provided in the act, to-wit, the ordinary; and if they are not satisfied with that, one-tenth of the defeated party may, of right, invoke the same contest before the superior court that they are making here. The statute is broad; they may contest. True, the act says that if the contest is on the fairness of the election or conduct of the ordinary, certain methods and recounts shall be had; but this does not limit the grounds of the contest. Indeed, the act makes special provisions to relieve any suspense; requiring the court to hear their case at the first term, and specially providing for an appeal to the highest legal tribunal in the state, the supreme court. That no *supersedeas* can issue does not take away or seriously affect the legal remedy. There are many cases where no *supersedeas* issues. Nor does the act even deny this; if the case goes to the supreme court, the case will stand, if appealed, as other cases on that subject. The remedy at law is, in my judg-

ment, complete, and no cause exists for an appeal to the extraordinary powers of a court of chancery.

One word more, this is a republican government; its whole machinery is dependent on the popular will as expressed in elections. It is of the utmost importance to the public weal that elections, in all their details, shall be free, and the courts shall not interfere with them in any way until the result is announced, and all the machinery of the election and the expression of the popular will be exhausted.

Again, objections to this bill are made on the ground of multifariousness,—each of these parties may have rights, but they have no such connection as allows them to file one bill,—and this, I think, is true. But this might be met by amendment, as by striking all except one party or set of parties out of the bill. Suppose this done. Then it is insisted that one of the parties—say Paul Jones—has no interest not common to the community, and that he has no right to come into court to rectify a public wrong; that the public may be trusted to protect itself; or, if he desires to be the movant, he must apply to the attorney general, who, I am bound to presume, will do his duty, and file a bill in the name of the public, with him as relator. It cannot be truly said that he has any wrongs under this bill not more or less participated in by the community in one degree or other. There are many men in Atlanta, as we all know, just as much injured as he is, and a very large number of people in a less degree; and each might file bills, and pray injunctions, the judgment upon none of which would bind anybody *pro* or *con* not a party, and the litigation be interminable.

Nobody who has given the least consideration to the subject can fail to see that the adoption of this local option law is a tremendous experiment on the part of the city of Atlanta. Large sacrifices will have to be made by some of our citizens, and, indeed, pecuniary losses (it is to be hoped of only a temporary character) will fall upon a great many of our people. Notably the large wholesale houses must suffer; the retail houses; the ordinary family grocery merchants, most of whom deal in considerable quantities in some form of spirituous liquors; the owners of real estate will doubtless be injured by the loss of rents; and the most of our people, white and black, will be largely interfered with in procuring what many of them deem a great luxury, and many look upon as a necessity for their health and comfort. I suppose the trade in liquors of all kinds in this city must be largely over $1,000,000. It is to be hoped that these larger losses will only be temporary; that the energy of the men whose business is thus stricken a death-blow will seek new channels for their means, and that other perhaps just as profitable avenues of trade will open, compensating all the class to which I have alluded, including the real-estate men; and that in the end no real loss will come,—while, as men believe, incalculable evils will be prevented, and immense good be attained, in the shape of industry, good morals, econ-

omy, and virtue, fully compensating the losses to which I have alluded. It is safe, however, to say that the experiment is a serious one, and by no means so small or so plain a matter as many men in their enthusiasm say and think. Let us hope that the friends of the measure, as it has succeeded, will not have cause to regret what has been done, and that far more good than evil will come from this experiment.

For these reasons I am compelled, by my conscientious convictions of duty, to refuse to stay, by my single will, the declaration of the result of this election. Doubtless there are men as good and wise and learned in the law as I am who think differently. But it is I, and not they, whose position and duty requires action, and I must do as my sense of duty requires.