ROUDEBUSH *v.* HARTKE ET AL.

No. 70–66.   Argued December 13, 1971—Decided February 23, 1972*

*Together with No. 70–67, *Sendak, Attorney General of Indiana* v. *Hartke et al.,* also on appeal from the same court.

Stewart, J., delivered the opinion of the Court, in which Burger, C. J., and White, Marshall, and Blackmun, JJ., joined. Douglas, J., filed an opinion dissenting in part, in which Brennan, J., joined, *post*, p. 26. Powell and Rehnquist, JJ., took no part in the consideration or decision of the cases.

*Donald A. Schabel* argued the cause for appellant in No. 70–66. With him on the briefs was *L. Keith Bulen.* *Richard C. Johnson,* Chief Deputy Attorney General of Indiana, argued the cause for appellant in No. 70–67. On the briefs were *Theodore L. Sendak,* Attorney General, *pro se, William F. Thompson,* Assistant Attorney General, and *Mark Peden,* Deputy Attorney General.

*John J. Dillon* argued the cause for appellees in both cases. With him on the brief for appellee Hartke were *David W. Mernitz* and *James L. Tuohy.*

Mr. Justice Stewart delivered the opinion of the Court.

The 1970 election for the office of United States Senator was the closest in Indiana history. The incumbent, Senator R. Vance Hartke (Hartke), was declared the winner by a plurality of 4,383 votes—a margin of approximately one vote per state precinct. On November 16, 1970, 13 days after the election, the Indiana Secretary of State certified to the Governor that Hartke

had been re-elected. On the following day, candidate Richard L. Roudebush (Roudebush) filed in the Superior Court of Marion County a timely petition for a recount.[1] Hartke moved in that court to dismiss the petition, arguing that the state recount procedure conflicted with the Indiana and Federal Constitutions. On December 1, the state court denied the motion to dismiss and granted the petition for a recount. It appointed a three-man recount commission and directed it to begin its task on December 8.

Hartke then filed a complaint in the United States District Court for the Southern District of Indiana asking for an injunction against the recount. He invoked federal jurisdiction under 28 U. S. C. § 1343 (3) [2] and claimed that the recount was prohibited by Art. I, § 5, of the Constitution of the United States, which delegates to the Senate the power to judge the elections, returns, and qualifications of its members.[3] A single district

---

[1] Roudebush filed similar petitions in 10 other counties. Recounts in all 11 counties have been postponed, pending the outcome of this cause.

[2] Title 28 U. S. C. § 1343 provides:

"The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

.     .     .     .     .

"(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States."

The District Court apparently viewed the suit as substantively based upon 42 U. S. C. § 1983, which authorizes a civil action on the part of a person deprived, under color of state law, "of any rights, privileges, or immunities secured by the Constitution . . . ."

[3] U. S. Const., Art. I, § 5, provides in pertinent part:

"Each House shall be the Judge of the Elections, Returns and Qualifications of its own Members . . . ."

18

judge issued an order temporarily restraining the recount pending decision by a three-judge district court. The Attorney General of Indiana then moved successfully to intervene as a defendant, and a three-judge court was convened pursuant to 28 U. S. C. § 2284. After taking testimony and hearing argument, the court ruled in Hartke's favor and issued an interlocutory injunction, 321 F. Supp. 1370, one judge dissenting. Roudebush and the Attorney General both brought direct appeals to this Court.[4]

On January 21, 1971, shortly after the jurisdictional statements were filed, the Senate administered the oath of office to Hartke, who had been issued a certificate of election by the Governor. Hartke was seated, however, "without prejudice to the outcome of an appeal pending in the Supreme Court of the United States, and without prejudice to the outcome of any recount that the Supreme Court might order . . . ."[5] Following the Senate's decision to seat him, Hartke moved to dismiss the appeals as moot. We consolidated both appeals and postponed further consideration of questions of jurisdiction to the hearing of the cause on the merits. 401 U. S. 972.

I

We consider first the claim that these appeals are moot. This claim is based upon the proposition, as stated in appellee Hartke's brief, that the "basic issue" before the Court is "whether appellee Hartke or appellant Roudebush is entitled to the office of United States Senator from Indiana." Since the Senate has now seated Hartke, and since this Court is without power to alter the Sen-

---

[4] Direct appeals from such interlocutory orders are authorized by 28 U. S. C. § 1253.

[5] 117 Cong. Rec. 6.

ate's judgment,[6] it follows, the argument goes, that the cause is moot.

The difficulty with this argument is that it is based on an erroneous statement of the "basic issue." Which candidate is entitled to be seated in the Senate is, to be sure, a nonjusticiable political question—a question that would not have been the business of this Court even before the Senate acted.[7] The actual question before us, however, is a different one. It is whether an Indiana recount of the votes in the 1970 election is a valid exercise of the State's power, under Art. I, § 4, to prescribe the times, places, and manner of holding elections,[8] or is a forbidden infringement upon the Senate's power under Art. I, § 5.

That question is not moot, because the Senate has postponed making a final determination of who is entitled to the office of Senator, pending the outcome of this lawsuit. Once this case is resolved and the Senate is assured that it has received the final Indiana tally, the Senate will be free to make an unconditional and final judgment under Art. I, § 5. Until that judgment is made, this controversy remains alive, and we are obliged to consider it.[9]

---

[6] See *Reed* v. *County Comm'rs*, 277 U. S. 376, 388: "[The Senate] is the judge of the elections, returns and qualifications of its members. Art. I, § 5. It is fully empowered, and may determine such matters without the aid of the House of Representatives or the Executive or Judicial Department."

[7] *Powell* v. *McCormack*, 395 U. S. 486.

[8] U. S. Const., Art. I, § 4, provides in pertinent part:

"The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators."

[9] See *Powell* v. *McCormack*, *supra*, at 496.

## II

It is the position of the appellants that, quite apart from the merits of the controversy, the three-judge District Court was barred from issuing an injunction by reason of 28 U. S. C. § 2283, which prohibits a federal court from enjoining state court proceedings except in a few specific instances.[10] This argument has weight, of course, only if the Indiana statutory recount procedure is a "proceeding in a State court" within the meaning of § 2283. This Court has said of a predecessor to § 2283,[11] "The provision expresses on its face the duty of 'hands off' by the federal courts in the use of the injunction to stay *litigation* in a state court." [12] More recently, we characterized the statute as designed to assure "the maintenance of state judicial systems for the decision of *legal controversies.*" [13]

We have in the past recognized that not every state court function involves "litigation" or "legal controversies." In the case of *Prentis* v. *Atlantic Coast Line R. Co.,* 211 U. S. 210, the Court reviewed a federal injunction preventing a state commission from fixing passenger rail rates. The Court assumed that the commission had the powers of a state court and that the predecessor of § 2283 governed any attempt by a federal court to enjoin the exercise of the commission's judicial powers.

---

[10] Title 28 U. S. C. § 2283 provides:

"A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments."

[11] The statute dates from 1793. Act of Mar. 2, 1793, § 5, 1 Stat. 334.

[12] *Toucey* v. *New York Life Ins. Co.,* 314 U. S. 118, 132. (Emphasis supplied.)

[13] *Atlantic Coast Line R. Co.* v. *Brotherhood of Locomotive Engineers,* 398 U. S. 281, 285. (Emphasis supplied.)

Nevertheless, the Court concluded that rate-making could be enjoined because it was legislative in nature. Hence, the Court held that § 2283 does not restrict a federal court from enjoining a state court when it is involved in a nonjudicial function.

To determine whether an Indiana court engages in a judicial function in connection with an election recount, we turn to the law of that State.[14] In Indiana every candidate has a right to a recount and can obtain one by merely filing a timely petition in the circuit or superior court of the appropriate county. If the petition is correct as to form, the state court "shall . . . grant such petition . . . and order the recount . . . ." When it grants a petition, the court is required to appoint three commissioners to carry out the recount. Once these appointments are made, the Indiana court has no other responsibilities or powers.[15]

The exercise of these limited responsibilities does not constitute a court proceeding under § 2283 within the test of *Prentis:* "A judicial inquiry investigates, declares and enforces liabilities as they stand on present or past facts and under laws supposed already to exist. That is its purpose and end." 211 U. S., at 226. The state courts' duties in connection with a recount may be characterized as ministerial, or perhaps administrative, but they clearly do not fall within this definition of a "judicial inquiry." The process of determining that the recount petition is correct as to form—that it contains the proper information, such as the names and addresses of all candidates, and is timely filed—is clearly not a judicial proceeding. Nonjudicial functionaries

[14] See *Hill* v. *Martin*, 296 U. S. 393, 398.

[15] Ind. Ann. Stat. §§ 29–5401 through 29–5417. The election recount provisions of some other States appear to give the state courts a broader function. See, *e. g.,* Conn. Gen. Stat. Rev. § 9–323; Va. Code Ann. § 24–277.1 (1969).

continually make similar determinations in the process-
ing of all kinds of applications.[16]

And finally, Hartke's complaint in this cause did not
ask the three-judge federal court to restrain the action
of the Indiana court as such. It did not seek to enjoin
the state court from ruling on the formal correctness
of the petition; it did not even seek to enjoin the state
court's appointive function. It sought, rather, to enjoin
the recount commission from proceeding after the court
had appointed the members of the commission.[17]

---

[16] The role of the Indiana courts in this connection is not unlike
that of the state court in the case of *Public Service Co. of Northern
Illinois* v. *Corboy*, 250 U. S. 153. A state statute there authorized
property owners to petition a state court to establish a drainage
district and to construct a drainage ditch. To assist in the planning
of a ditch, the state court was empowered to appoint a drainage
commissioner. The commissioner served on a commission that sub-
mitted plans for construction. The state court could either accept
or reject these submissions. If it approved plans, the court allocated
funds and supervised construction. Applying *Prentis,* this Court
held that these activities were not judicial, and that enjoining the
construction of a drainage ditch was not enjoining a state court "pro-
ceeding." See also *Central Electric & Gas Co.* v. *City of Stromsburg,*
192 F. Supp. 280, aff'd, 289 F. 2d 217 (federal court could enjoin
a state court's appointment of an appraiser pursuant to a state
statute); *Central R. Co. of New Jersey* v. *Martin,* 19 F. Supp.
82, aff'd *sub nom. Lehigh Valley R. Co.* v. *Martin,* 100 F. 2d 139
(federal court could enjoin ministerial act of state judge, pursuant
to state statute, converting a state tax into a lien against the tax-
payer); *Weil* v. *Calhoun,* 25 F. 865 (federal court could enjoin a
state ordinary, having the powers of a probate judge, from declaring
the results of a county election).

[17] The only injunctive relief sought in Hartke's amended com-
plaint was "that the court permanently restrain and enjoin the de-
fendants and restraining and enjoining the defendants Samuel Walker,
John R. Hammond and Duge Butler [the recount commissioners]
from convening and commencing a recount, and the defendant
Richard L. Roudebush and all persons acting in his behalf or in
concert with him [from] taking any further action to use said
machinery and procedures to carry forward a recount of the vote

We conclude that the three-judge District Court was not prohibited by § 2283 from issuing and had power under 28 U. S. C. § 2281 to issue, an injunction in this cause.

## III

We turn, therefore, to the merits of the District Court's decision. The Indiana Election Code calls for the vote to be initially counted, in each precinct, by an election board. After recording the voting machine totals, the board seals the machines. Paper ballots, including absentee ballots, are then counted and tallied. Counted ballots are placed in a bag and sealed. Ballots that bear distinguishing marks or are mutilated or do not clearly reveal the voter's choice are not counted. These rejected ballots are sealed in a separate bag. Both bags are preserved for six months and may not be opened except in the case of a recount.[18]

If a recount is conducted in any county, the voting machine tallies are checked and the sealed bags containing the paper ballots are opened. The recount commission may make new and independent determinations as to which ballots shall be counted. In other words, it may reject ballots initially counted and count ballots initially rejected. Disputes within the commission are settled by a majority vote. When the commission finishes its task it seals the ballots it counted in one bag, and the ballots it rejected in another. Once the recount is completed, all previous returns are superseded.[19]

The District Court held these procedures to be contrary to the Constitution in two ways. First, the court found that in making judgments as to which ballots to

for the office of United States Senator in the general election of November 3, 1970." An interlocutory injunction against the same defendants was also sought.

[18] Ind. Ann. Stat. §§ 29–5201 through 29–5220.

[19] Ind. Ann. Stat. §§ 29–5401 through 29–5417.

count, the recount commission would be judging the qualifications of a member of the Senate. It held this would be a usurpation of a power that only the Senate could exercise. Second, it found that the Indiana ballots and other election paraphernalia would be essential evidence that the Senate might need to consider in judging Hartke's qualifications. The court feared that the recount might endanger the integrity of those materials and increase the hazard of their accidental destruction. Thus, the court held that, even if the commission would not be usurping the Senate's exclusive power, it would be hindering the Senate's exercise of that power.

We cannot agree with the District Court on either ground.[20] Unless Congress acts, Art. I, § 4, empowers the States to regulate the conduct of senatorial elections.[21] This Court has recognized the breadth of those powers: "It cannot be doubted that these comprehensive words embrace authority to provide a complete code for congressional elections, not only as to times and places, but in relation to notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns; in short, to enact the numerous requirements as to procedure and safeguards which experience shows are necessary in order to enforce the

---

[20] The District Court cited three cases decided by the Indiana Supreme Court as authority for its rulings. *State ex rel. Batchelet* v. *Dekalb Circuit Court*, 248 Ind. 481, 229 N. E. 2d 798; *State ex rel. Beaman* v. *Circuit Court of Pike County*, 229 Ind. 190, 96 N. E. 2d 671; *State ex rel. Acker* v. *Reeves*, 229 Ind. 126, 95 N. E. 2d 838. These cases held that the Indiana Constitution prohibited recounts in certain state elections. They do not address the federal constitutional question at issue in this cause.

[21] See n. 8, *supra*.

fundamental right involved." *Smiley* v. *Holm*, 285 U. S. 355, 366.

Indiana has found, along with many other States, that one procedure necessary to guard against irregularity and error in the tabulation of votes is the availability of a recount. Despite the fact that a certificate of election may be issued to the leading candidate within 30 days after the election, the results are not final if a candidate's option to compel a recount is exercised.[22] A recount is an integral part of the Indiana electoral process and is within the ambit of the broad powers delegated to the States by Art. I, § 4.

It is true that a State's verification of the accuracy of election results pursuant to its Art. I, § 4, powers is not totally separable from the Senate's power to judge elections and returns. But a recount can be said to "usurp" the Senate's function only if it frustrates the Senate's ability to make an independent final judgment. A recount does not prevent the Senate from independently evaluating the election any more than the initial count does. The Senate is free to accept or reject the

---

[22] The Secretary of State is required by statute to certify to the Governor the leading candidate as duly elected "as soon as he shall receive" certified statements from the counties. The statutory period for receiving those statements is 26 days. The Governor is required to give a certificate of election to each certified candidate. Ind. Ann. Stat. §§ 29–5306 through 29–5309.

A petition for a recount may be filed 15 days after the election is held. § 29–5403. The petition cannot be granted nor the recount commission appointed by the court for another 25 days. § 29–5409. The recount may not commence until at least five days after the commission is appointed. § 29–5411. Additional time elapses before the results are made final and the appropriate persons are notified. Thus, the recount is unlikely to be completed before the Governor becomes obligated by statute to issue a certificate of election based on the initial count. Nevertheless, the recount supersedes the initial count even though a certificate of election may have been issued. § 29–5415.

apparent winner in either count,[23] and, if it chooses, to conduct its own recount.[24]

It would be no more than speculation to assume that the Indiana recount procedure would impair such an independent evaluation by the Senate. The District Court's holding was based on a finding that a recount would increase the probability of election fraud and accidental destruction of ballots. But there is no reason to suppose that a court-appointed recount commission would be less honest or conscientious in the performance of its duties than the precinct election boards that initially counted the ballots.

For the reasons expressed, we conclude that Art. I, § 5, of the Constitution, does not prohibit Indiana from conducting a recount of the 1970 election ballots for United States Senator. Accordingly, the judgment of the District Court is reversed.

*It is so ordered.*

MR. JUSTICE POWELL and MR. JUSTICE REHNQUIST took no part in the consideration or decision of these cases.

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BRENNAN concurs, dissenting in part.

While I agree with the Court that the cases are not moot and that the three-judge court was not barred by 28 U. S. C. § 2283 from issuing an injunction, I disagree on the merits.

---

[23] The Senate's power to judge the qualifications of its members is limited to the qualifications expressly set forth in the Constitution. *Powell* v. *McCormack*, 395 U. S. 486. One of those qualifications is that a Senator be elected by the people of his State. U. S. Const., Amend. XVII.

[24] The Senate itself has recounted the votes in close elections in States where there was no recount procedure. *E. g., O'Conor* v. *Markey*, Senate Election, Expulsion and Censure Cases from 1789 to 1960, S. Doc. No. 71, 87th Cong., 2d Sess., 144 (1962).

By virtue of Art. I, § 5, Senate custom, and this Court's prior holdings, the Senate has exclusive authority to settle a recount contest once the contestee has been certified and seated, albeit conditionally.

Article I, § 5, provides: "Each House shall be the Judge of the Elections, Returns and Qualifications of its own Members." To implement this authority, the Senate has established a custom of resolving disagreements over which of two or more candidates in a senatorial race attracted more ballots. The apparent loser may initiate the process by filing with the Senate a petition stating (a) what voting irregularities he suspects, and (b) how many votes were affected. Upon receipt of such a petition, a special committee may be authorized to investigate the charges alleged. If the allegations are not frivolous and would be sufficient, if true, to alter the apparent outcome of the election, actual ballots may be and have been subpoenaed to Washington for recounting by the committee. Also, witnesses may be required to testify. The committee performs the function of deciding both the factual issues and what allegations would be sufficient to warrant favorable action on a petition.

Thus, in the Iowa senatorial campaign of 1924, Smith Brookhart was the apparent winner over Daniel Steck, who filed with the Senate the complaint that illegal votes had been cast for his opponent. The petition was referred to the Subcommittee on Privileges and Elections which was authorized to make a full investigation. It heard testimony and recounted the ballots in Washington. The committee and eventually the Senate agreed that, contrary to earlier assumptions, Steck had won. Accordingly, Brookhart was replaced by Steck as a Senator from Iowa. See *Steck* v. *Brookhart,* Senate Election, Expulsion and Censure Cases from 1789 to 1960, S. Doc. No. 71, 87th Cong., 2d Sess., 116–117 (1962). See also *Hurley* v. *Chavez, id.,* at 151 (upon re-

counting, the subcommittee and the Senate found that neither candidate had won and the seat was declared vacant); *Sweeney* v. *Kilgore, id.*, at 145 (adjustments for fraudulent campaign tactics were insufficient to reverse official outcome); *O'Conor* v. *Markey, id.*, at 144 (recount of all votes cast in 1946 Maryland race revealed too few mistakes to cause reversal in outcome); *Willis* v. *Van Nuys, id.*, at 138–139 (petition rejected as insufficient grounds for recount); *Bursum* v. *Bratton, id.*, at 114 (recount will not be conducted absent a showing of grounds to doubt the accuracy of official count).

The Senate's procedure is flexible:

> "The Senate has never perfected specific rules for challenging the right of a claimant to serve, inasmuch as each case presents different facts. The practice has been to consider and act upon each case on its own merits, although some general principles have been evolved from the precedents established.

> "This practice of viewing each case affecting claims to membership on its individual merits has resulted in a variety of means by which the cases are originated. The Senator-elect to a seat in the Senate generally appears with his credentials. On some occasions, when these credentials are presented, some Senators will submit a motion that the credentials be referred to the Committee on Rules and Administration, and that, pending report, he be denied the privilege of taking the oath of office. Upon adoption of such a motion, the Senator-elect steps aside and the Senate seat is vacant for the time being. Any question or motion arising or made upon the presentation of such credentials is privileged and would be governed by a majority vote.

> "On other occasions, the Senator-elect is permitted to take the oath of office, and this is now regarded and

followed as the proper procedure, but thereafter inquiry as to his election is undertaken by the Senate. Resolutions calling for such investigations may be offered by any Senator. In an instance where a newspaper charged a Senator had obtained his office by illegal means, the Senator himself offered a resolution calling for an investigation of the charges.

"The usual origin of such cases, however, is by petition. The contestant may file such a petition, protesting the seating of the contestee, and asserting his own right to the seat in question. It is not required to be filed prior to the swearing-in of the contestee, and no rights are lost if filed afterwards. In some cases, petitions have been signed and filed by others than the contestant, simply protesting against the seating of the contestee, without asserting any claim in behalf of the defeated candidate. Any number of citizens may submit such a petition; and it might make charges of illegal practices in the election, or of the improper use of money, or even of the unfitness of the claimant to serve in the United States Senate.

"A petition of contest is addressed to the U. S. Senate, and may be laid before the Senate by the presiding officer or formally presented by some Senator. There is no prescribed form for such a petition. It is somewhat analogous to a complaint filed in a lawsuit. It customarily sets forth the grounds or charges upon which the contest is based, and in support of which proof is expected to be adduced. The petition is usually referred to the Committee on Rules and Administration, which has jurisdiction over '. . . matters relating to the election of the President, Vice President, or Members of Congress; corrupt practices; contested elections; credentials and qualifications; [and] Federal elections generally . . . .'

"The Legislative Reorganization Act of 1946 empowers each standing committee of the Senate, including any subcommittee of any such committee, to hold such hearings, to sit and act at such times and places during the sessions, recesses, and adjourned periods of the Senate, to require by subpena or otherwise the attendance of such witnesses and the production of such correspondence, books, papers, and documents, to take such testimony and to make such expenditures (not in excess of $10,000 for each committee during any Congress) as it deems advisable. Each such committee may make investigations into any matter within its jurisdiction and may report such hearings as may be had by it." S. Doc. No. 71, 87th Cong., 2d Sess., vii–viii (1962).

The parties before the Court are apparently in agreement that, as is true of several other arenas of public decisionmaking, there has been a "textually demonstrable constitutional commitment" (*Baker* v. *Carr,* 369 U. S. 186, 217; *Powell* v. *McCormack,* 395 U. S. 486, 518–549) to the Senate of the decision whether Hartke or Roudebush received more lawful votes. Our case law agrees. Both *Barry* v. *Cunningham,* 279 U. S. 597, and *Reed* v. *County Comm'rs,* 277 U. S. 376, were generated during the disputed 1926 senatorial election in Pennsylvania in which William Vare appeared to have defeated William Wilson. In 1926 a Senate committee was authorized to inquire into the means used to influence the nomination of candidates in that election. The committee asked some local county commissioners to produce certain ballots but were refused, whereupon members of the committee sought a federal court order compelling the ballots' production. On appeal, this Court held that because the Senate had been fully competent to use its own subpoena power to secure the ballots, the District Court had lacked jurisdiction to act only at

the behest of the committee. In the course of discussing the committee's scope of authority the Court said:

> "The resolutions are to be construed having regard to the power possessed and customarily exerted by the Senate. It is the judge of the elections, returns and qualifications of its members. Art. I, § 5. It is fully empowered, and may determine such matters without the aid of the House of Representatives or the Executive or Judicial Department. That power carries with it authority to take such steps as may be appropriate and necessary to secure information upon which to decide concerning elections." 277 U. S., at 388.

In *Barry* v. *Cunningham, supra,* the Court upheld the Senate's power under Art. I, § 5, to call witnesses before it in order to determine the factual history of the same controverted 1926 election involved in *Reed.* In answer to the argument that Vare had not been a member of the Senate inasmuch as he was unseated (and therefore the witness was relieved of the duty to answer inquiries) the Court held:

> "It is enough to say . . . that upon the face of the returns [Vare] had been elected and had received a certificate from the Governor of the state to that effect. Upon these returns and with this certificate, he presented himself to the Senate, claiming all the rights of membership. Thereby, the jurisdiction of the Senate to determine the rightfulness of the claim was invoked and its power to adjudicate such right immediately attached by virtue of § 5 of Article I of the Constitution." *Barry* v. *Cunningham, supra,* at 614.

And *Cunningham* holds that, "The Senate, having *sole* authority under the Constitution to judge of the elections, returns and qualifications of its members, may exer-

cise in its own right the incidental power of compelling the attendance of witnesses without the aid of a statute." *Id.,* at 619 (emphasis added). Judicial interference with this "indubitable power" was said to be possible only upon a clear showing of "such arbitrary and improvident use of the power as will constitute a denial of due process of law." *Id.,* at 620.

Once certification by the Governor has been presented to the Senate, a State may not by conducting a recount alter the outcome of the election—a principle that has been widely recognized by state courts. See *Laxalt* v. *Cannon,* 80 Nev. 588, 397 P. 2d 466, and cases cited therein.

Thus, although the Houses of Congress may not engraft qualifications for membership beyond those already contained in Art. I, *Powell* v. *McCormack,* 395 U. S. 486, where all that is at stake is a determination of which candidates attracted the greater number of lawful ballots, each has supreme authority to resolve such controversies.[1]

Although all agree that in the end the Senate will be the final judge of this seating contest, the nub of the instant case comes down to opposing positions on how important it may be to preserve for the Senate the opportunity to ground its choice in unimpeachable evidence. It is with regard to this phase of the cases that I disagree with the majority.

The Senate may conclude that only a recomputation supervised by it under laboratory conditions could serve as an acceptable guide for decision. Such a recomputation, however, will not be possible once local investigators have exposed these presently sealed ballots to human judgment.

---

[1] Several areas of decisionmaking are immune from judicial review by federal courts. The cases are reviewed in *Baker* v. *Carr,* 369 U. S. 186.

Obviously, state officials might desire to preview these presently sealed ballots in order to influence the Senate's deliberations.

Charges or suspicions of inadvertent or intentional alteration, however baseless, will infect the case. No longer will the constitutionally designated tribunal be able to bottom its result on unassailed evidence. Since even a slight adjustment in the tally could dramatically reverse the outcome, the federal interest in preserving the integrity of the evidence is manifest.

What the Senate should do in the merits is not a justiciable controversy. The role of the courts is to protect the Senate's exclusive jurisdiction over the subject matter, as did this Court in *Barry* v. *Cunningham, supra.* The Senate's Subcommittee on Privileges and Elections, for example, might subpoena these ballots, thereby precluding, as a practical matter, any local recount. Or the Senate might ask for a local recount. Either course is within the control and discretion of the Senate and is unreviewable by the courts. The District Court had jurisdiction only to protect the Senate's choice,[2] not to make the choice for or on behalf of the Senate.

I would affirm the judgment of the District Court.

---

[2] Cf. *Ex parte Peru,* 318 U. S. 578.