**Stephen T. MITCHELL, Plaintiff–Appellant,**

**v.**

**Harvey FISHBEIN, Chair of the Departmental Screening of the Supreme Court Panel of the Assigned Counsel Plan for New York County, in his**

---

personal and official capacity, Gerald Lebovits, Andrea Hirsch, Norman Reimer, Marvin Ray Raskin, Emily Olshansky, and Other Unknown Persons, Defendants–Appellees.

Isabel ALICIA, George Golfinopoulous, and the City of New York, Defendants.

Docket No. 03–7454.

United States Court of Appeals, Second Circuit.

Argued: Feb. 20, 2004.

Decided: Aug. 3, 2004.

Final briefs filed March 8, 2004.

Stephen T. Mitchell pro se, New York, New York, Plaintiff–Appellant.

Robert H. Easton, Assistant Solicitor General, New York, New York (Eliot Spitzer, Attorney General of the State of New York, Michelle Aronowitz, Deputy Solicitor General, New York, New York, on the brief), for Defendants–Appellees.

Before: OAKES, KEARSE, and CABRANES, Circuit Judges.

KEARSE, Circuit Judge.

Plaintiff *pro se* Stephen T. Mitchell, who was formerly certified to serve as court-appointed counsel for indigent defendants accused of felonies in New York State's First Judicial Department ("First Department"), appeals from so much of a judgment of the United States District Court for the Southern District of New York, John G. Koeltl, *Judge*, as dismissed his second amended complaint asserting claims under 42 U.S.C. §§ 1981 and 1983 alleging that defendants-appellants, who were responsible for such certifications, terminated his certification and refused to recertify him because of his race and in retaliation for his complaints of racial discrimination. The district court dismissed those claims pursuant to Fed.R.Civ.P. 12(b) on the grounds (1) that the appointment of counsel is a judicial act and that the individual defendants were thus performing a function closely associated with the judicial process and hence were entitled to absolute immunity from Mitchell's claims for monetary relief, (2) that Mitchell failed to meet the requirements for injunctive relief under § 1983, and (3) that his claims for declaratory relief were inex-

tricably intertwined with the merits of a state-court judgment and hence, pursuant to the *Rooker–Feldman* doctrine, were beyond a federal district court's subject matter jurisdiction. On appeal, Mitchell contends principally that the district court erred in viewing the individual defendants' functions as integrally related to the judicial process and in holding the *Rooker–Feldman* doctrine applicable. For the reasons that follow, we vacate the judgment and remand for further proceedings.

## I. BACKGROUND

To the extent that Mitchell's second amended complaint ("Complaint") was dismissed for failure to state a claim on which relief can be granted, we accept as true the factual allegations of the Complaint and draw all reasonable inferences therefrom in his favor. To the extent that the Complaint was dismissed for lack of subject matter jurisdiction, we consider in addition matters outside the Complaint of which defendants asked the district court to take judicial notice, as well as other matters of law and public record governing the certification of attorneys who may be appointed to represent indigent defendants.

### A. *The Parties and the Assigned–Counsel Plan*

Mitchell is an African–American attorney licensed to practice law in New York State (the "State"). He has previously served as assigned counsel for indigent persons accused of felonies, in accordance with an assignment plan required by New York law.

State law, *see* N.Y. County Law art. 18–B ("Article 18–B"), requires

[t]he governing body of each county and the governing body of the city in which a county is wholly contained [to] place in operation throughout the county a plan for providing counsel to persons charged with a crime [for which a sentence of imprisonment is authorized] . . . who are financially unable to obtain counsel.

N.Y. County Law § 722; *see id.* § 722–a. The municipality is required, *inter alia*, to compensate, at statutorily capped rates, attorneys assigned pursuant to such a plan. *See id.* §§ 722–b, 722–e.

The City of New York (the "City"), which encompasses the First Department and part of the State's Second Judicial Department ("Second Department"), has a plan that was adopted in 1965 by executive order of the City's Mayor, in cooperation with the Association of the Bar of the City of New York and five county bar associations (the "Bar Associations"), and was approved by the Judicial Conference of the State. Under the City's plan, its principal provider of legal services to indigent defendants is the Legal Aid Society; additional services are furnished by individual assigned attorneys who have been recommended pursuant to a joint undertaking by the Bar Associations (the "Assigned Counsel Plan" or the "Plan"). The Plan required each of the Bar Associations to prepare and certify a list of attorneys

who are admitted to practice in the State of New York and who, in the opinion of the bar association, which shall consider their experience in criminal practice, are competent to give adequate representation to defendants under Article 18–B of the County Law.

Assigned Counsel Plan art. II. The composite list of attorneys "designated by the bar association[s] as available for service in either the Supreme Court or the Criminal Court or both," *id.* art. II, § 1, is generally referred to as an "18–B Panel."

The Plan also authorizes the Appellate Division of the New York Supreme Court, First and Second Departments, to "pro-

mulgate such rules with respect to this Plan as they may deem necessary." *Id.* art. VIII. Rules and standards adopted by the Appellate Division First Department (the "Rules" or "Appellate Division 18–B Rules") regulate, *inter alia,* the selection, performance, and professional conduct of individual 18–B Panel attorneys. *See* N.Y. Comp.Codes R. & Regs. tit. 22, § 612.0 *et seq.* (adopted July 1, 1980). At the times pertinent to this action, an attorney seeking certification to the 18–B Panel for service in the New York Supreme Court—which has jurisdiction over felony cases—was required to have tried at least three felony matters. (*See* Complaint ¶ 7.) The Plan allows "the appropriate Appellate Division" to add an attorney to, or remove a previously certified attorney from, its 18–B Panel "at any time." Assigned Counsel Plan art. II, § 5. It also allows the Bar Associations to make additions to and deletions from their respective lists of approved attorneys periodically. *See id.* The Rules provide that the appointment of an attorney to an 18–B Panel is "for an indefinite term subject to recertification as directed by the justices of the Appellate Division, First Department." N.Y. Comp.Codes R. & Regs. tit. 22, § 612.2 (as amended, April 11, 1994).

In addition to adopting the above Rules, the Appellate Division First Department created a Central Screening Committee (the "Screening Committee" or "Committee") to screen all applications for 18–B Panel membership. *See id.* § 612.6(a) (as amended, April 11, 1994). The Rules provide that the members of the Committee may be chosen for three-year terms either "by the presidents of the [Bar A]ssociations or [by] the justices of the Appellate Division, First Department," *id.* § 612.4 (as amended, April 11, 1994); members' terms may be extended by the Appellate Division, *see id.* The Committee's bylaws, as approved by the Appellate Division,

provide that, with respect to decisions on certification to the panel, "[t]he action of the Committee is final and non-appealable." Screening Committee Bylaw 2.7. Neither the bylaws nor the Appellate Division 18–B Rules make any provision for judicial review of a Committee decision.

Defendants-appellees are members of the Screening Committee, including the Committee's present Chair. They are self-described "volunteers" (Hearing Transcript, May 24, 2002 ("May Tr."), at 9) who are apparently entitled to representation and indemnification by the State under Public Officers Law § 17 (McKinney 2001), *see* Formal Opinion of the State Attorney General dated December 20, 1979, 1979 N.Y. Op. Att'y Gen. 71, 71–72, and are referred to hereafter as the "State Defendants."

### B. *Mitchell's Complaint*

The Complaint alleges the following events. Mitchell began the practice of criminal law in approximately 1986. Between 1986 and 1989, he was an Assistant District Attorney in New York County. For nearly four years between 1991 and 1995, he was a member of the Kings County (Second Department) 18–B Supreme Court Panel. (*See* Complaint ¶ 5.) He was appointed to the New York County (First Department) 18–B Supreme Court Panel (or "the Panel") in 1995. (*See id.* ¶ 1.) By the spring of 1998, Mitchell had tried more than 20 felony matters to verdict, including three murder trials. (*See id.* ¶ 7.) He had also negotiated pleas in dozens of felony matters as lead counsel for indigent defendants. (*See id.* ¶ 9.) In addition, he had briefed and argued "at least two appeals[,] one" state and "the other" federal. (*Id.* ¶ 11.) During the period 1986–1998, Mitchell was never reprimanded for poor performance or misconduct with respect to his representation of an indigent client.

(*See id.* ¶¶ 6, 10.) His record of winning acquittals was "outstanding," and both his peers and the judges before whom he tried cases had high regard for his trial skills and experience. (*Id.* ¶ 8.)

Mitchell applied for recertification to the First Department 18–B Supreme Court Panel in 1997 or 1998. (*See id.* ¶ 16.) In addition to his professional activities, Mitchell had exhibited a deep commitment to the well-being of the African–American community (*see id.* ¶ 12), and in attachments to his application for recertification, and again in an interview with a Screening Committee member, Mitchell complained that the Plan's administration was infected with racism (*see, e.g., id.* ¶¶ 18–21). He contended that "many white assigned counsel attorneys were not providing zealous advocacy for their African–American and Latin[o] clients" (*id.* ¶ 19) and "were more interested in 'churning' cases in order to increase their fees ... than [in] putting forth a serious effort to represent their clients effectively" (*id.*); that "the Assigned Counsel Plan deliberately suppressed the number of African–American attorneys who were eligible to try homicide cases" (*id.* ¶ 20); and that the Committee "deliberately declined to re-certify a disproportionate number of African–American attorneys to the First Department indigent defense panel as a means of reducing the overall numbers of African–American attorneys on the panel" (*id.* ¶ 21).

By letter dated March 18, 1998, the Committee notified Mitchell that it was denying his application for recertification and terminating his appointment to the First Department 18–B Panel. (*See id.* ¶ 2.) The Committee gave no reasons for its decision. (*See, e.g., id.* ¶ 22.) The text of the one-page letter read as follows:

> We regret to inform you that following a thorough and careful review of your recertification application, a decision has been made by the Central Screening Committee to terminate your appointment to the Assigned Counsel Plan felony and misdemeanor panels. That decision is final.
>
> On behalf of the Central Screening Committee, we want to express our appreciation to you for your years of service to the indigent accused.
>
> You are expected to continue to handle to conclusion any assigned cases you now have and to submit a voucher for your work.

(Letter from Committee Chair Norman L. Reimer to Stephen T. Mitchell dated March 18, 1998 ("Committee Letter to Mitchell").)

Mitchell commenced the present action in March 2001 under 42 U.S.C. §§ 1981 and 1983 and state law, alleging that the State Defendants had terminated his appointment to the First Department 18–B Panel on the basis of his race and in retaliation for his complaints of racial discrimination. (*See, e.g.,* Complaint ¶¶ 22–25.) The relief requested included (a) awards of compensatory and punitive damages from the State Defendants in their personal capacities; (b) a judgment declaring that the Committee's refusal to recertify Mitchell to the 18–B Panel violated his rights under the First and Fourteenth Amendments to the Constitution; and (c) an injunction requiring his reappointment to the Panel. (*See id.* ¶¶ 14, 26, 38, 50, 62, 74, 86; *id.* at 1, 19.) Mitchell sought "declaratory and injunctive relief so that he can earn compensation as an indigent defense lawyer and so that he will not be prejudiced with the stigma of being prohibited from membership [in] an association of attorneys." (*Id.* at 19.)

Mitchell also asserted claims against the City and two city employees, alleging that they had unjustifiably withheld payments

due him for his past representation of indigent defendants. (*See id.* ¶¶ 100–104.) Those claims were subsequently settled, are not at issue on this appeal, and will not be discussed further.

## C. *District Court's Decision*

The State Defendants moved to dismiss the Complaint pursuant to Fed.R.Civ.P. 12(b)(6) and (1) for failure to state a claim on which relief can be granted and for lack of subject matter jurisdiction, respectively. They contended principally (a) that, because the courts have the obligation under the Sixth and Fourteenth Amendments to see that indigent persons accused of crimes are not denied the right to be represented by counsel, and because the Appellate Division First Department had delegated to the Committee the responsibility for certifying attorneys who were willing and qualified to provide such representation, the face of the Complaint showed that the State Defendants were performing essentially judicial functions and were thus entitled to quasi-judicial immunity against Mitchell's claims; and (b) that Mitchell's claims challenging the denial of recertification constituted challenges to State judicial decisions, and that, under the *Rooker–Feldman* doctrine, the district court thus lacked jurisdiction over those claims.

Mitchell opposed the motion, arguing, *inter alia,* that the State Defendants were not entitled to judicial immunity because their decision to deny him recertification to the 18–B Panel was not a judicial act but rather was an administrative act in the nature of an employment decision, for which even judges would not be entitled to absolute immunity. (*See* Plaintiff's Memorandum of Law in Opposition to Defendants' Motion To Dismiss at 17.) He argued that the *Rooker–Feldman* doctrine was inapplicable because there had been no judicial proceeding relating to the Com-

mittee's evaluation of his application for recertification; hence his action did not seek review of any state-court proceeding. (*See id.* at 21.) Rather, Mitchell was asserting previously unadjudicated claims that "state and city officials discriminated against him because of his race and [in violation of] his rights to free speech." (*Id.*)

In an Opinion and Order dated August 12, 2002, reported at 216 F.Supp.2d 283, the district court granted the State Defendants' motion to dismiss. The court ruled that those defendants were entitled to absolute immunity from any claims for money damages with regard to the denial of Mitchell's application for recertification because, "[i]n deciding whether to re-certify the plaintiff to the Panel, [they] were performing a function closely associated with the judicial process." 216 F.Supp.2d at 287. The district court reasoned that, in evaluating Mitchell's application, the Committee acted "under rules adopted by, and issued under the authority of, the justices of the New York State Supreme Court, Appellate Division, First Department," *id.* (citing N.Y. Comp.Codes R. & Regs. tit. 22, § 612.0), and that the function the Committee performed "forms an integral part of the process of appointing counsel for indigent defendants," which is itself a judicial act, 216 F.Supp.2d at 287.

The district court also held that Mitchell failed to state a claim under § 1983 for an injunction ordering the Committee to reappoint him to the Panel. The court noted that "'injunctive relief [is] not [to] be granted' in a § 1983 action brought against 'a judicial officer for an act or omission taken in such officer's judicial capacity,' 'unless a declaratory decree was violated or declaratory relief was unavailable,'" and that Mitchell had alleged neither the violation of a declaratory decree nor the unavailability of declaratory relief. 216

F.Supp.2d at 287 (quoting 42 U.S.C. § 1983).

The district court ruled that the *Rooker–Feldman* doctrine barred the court from entertaining Mitchell's claims for declaratory relief and provided an alternative basis for the dismissal of his claims for other relief for the denial of recertification. The court noted that "[o]rdinarily, the *Rooker–Feldman* doctrine does not apply to a case in which the decision being directly or indirectly contested is a decision of a state administrative agency that has never been reviewed by a state court, even if the agency proceedings were quasi-judicial in form," for "[i]n such cases, ... no state court decision exists for the federal court to defer to." *Id.* at 288. In this case, however, the court concluded that the doctrine barred Mitchell's challenge to the Committee's unreviewed determination because

> where the administrative body issuing the judgment is an agent of the state court system ... it [can] be said that the federal courts are sitting in review of a state court judgment, thereby triggering *RookerFeldman*'s comity and federalism concerns.... *[S]ee Thomas v. Kadish,* 748 F.2d 276, 281–82 (5th Cir.1984) (district court lacked jurisdiction to hear claim that state Board of Bar Examiners denied bar application for constitutionally impermissible reasons).
>
> ... [T]he Plan and Committee function under the authority of the New York courts and the rules adopted thereby. Therefore, this Court has no jurisdiction to reverse or modify their decisions, whether by declaratory or injunctive relief, and must dismiss the plaintiff's claims to the extent that he seeks orders declaring either that the decision denying his certification was wrongful or that he should be re-ap-

pointed to the Panel or that the Panel is required to re-appoint him.

216 F.Supp.2d at 288–89 (internal quotation marks omitted); *see also id.* at 289 n. 1 ("The *Rooker–Feldman* doctrine can also bar any claims for damages that are inextricably intertwined with the Committee's decision not to re-appoint the plaintiff.").

Other claims by Mitchell for orders requiring the Committee to state its reasons for the denial of recertification and for disclosure of Committee records were dismissed without prejudice, but were not further pursued.

## II. DISCUSSION

On appeal, Mitchell contends principally that the district court erred in ruling (1) that the State Defendants have absolute immunity on his claims for damages for the denial of recertification, and (2) that the *Rooker–Feldman* doctrine deprived the district court of jurisdiction over his claims. The State Defendants contend that Mitchell waived the latter argument by first making it at oral argument of this appeal, without having addressed it in his appellate brief, and they invite us to affirm the *Rooker–Feldman* ruling based on that waiver. In the circumstances of this case, we decline that invitation.

▮ Although we ordinarily will not consider arguments that an appellant has failed to make in his opening brief, *see Thomas v. Roach,* 165 F.3d 137, 146 (2d Cir.1999), this principle is designed to promote the orderly briefing, argument, and consideration of appeals, *see, e.g., Booking v. General Star Management Co.,* 254 F.3d 414, 418 (2d Cir.2001) ("if an appellant raises a new argument in a reply brief an appellee may not have an adequate opportunity to respond to it"), and does not affect appellate jurisdiction, *see, e.g., United States v. Barnes,* 158 F.3d 662, 672 (2d

Cir.1998). This Court has ample discretion to excuse an appellant's failure to argue an issue in his opening brief and to give the parties a further opportunity to address the issue. We are especially inclined to exercise that discretion here, where the question belatedly raised by the appellant is the correctness of the district court's conclusion that it lacks subject matter jurisdiction over a category of claims, and that question has been the subject of both analysis by the district court, *see* 216 F.Supp.2d at 288–89, and—notwithstanding the appellant's initial silence on the issue—briefing on appeal by the appellees (*see* Defendants–Appellees' brief on appeal at 22–24). On this appeal, we requested additional briefing, and we have received letter briefs from Mitchell addressing the *Rooker–Feldman* issue and a responding letter brief from the State Defendants. The matter has now been fully briefed, and we decline to resolve the jurisdictional issue on the basis of waiver.

For the reasons that follow, we conclude that the *Rooker–Feldman* doctrine is not applicable to Mitchell's claims and that the State Defendants were not entitled to absolute immunity. Because the *Rooker–Feldman* doctrine affects the threshold issue of the district court's subject matter jurisdiction, we address that doctrine before proceeding to the question of the State Defendants' absolute immunity defense.

### A. *Applicability of the* Rooker–Feldman *Doctrine*

The *Rooker–Feldman* doctrine recognizes that Congress's grant to federal district courts of jurisdiction to entertain suits raising federal questions, *see* 28 U.S.C. § 1331, "is a grant of original jurisdiction, and does not authorize district courts to exercise appellate jurisdiction over *state-court* judgments, which Congress has reserved to th[e United States Supreme] Court, see 28 U.S.C. § 1257(a)." *Verizon Maryland Inc. v. Public Service Commission,* 535 U.S. 635, 644 n. 3, 122 S.Ct. 1753, 152 L.Ed.2d 871 (2002) (*"Verizon Maryland"*) (emphasis added). Thus, "federal district courts do not have jurisdiction over claims that have already been decided, or that are 'inextricably·intertwined' with issues that have already been decided, *by a state court."* *Bridgewater Operating Corp. v.·Feldstein,* 346 F.3d 27, 29 (2d Cir.2003) (per·curiam) (emphasis added). *See generally District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462, 476, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983) (*"Feldman"*); *Rooker v. Fidelity Trust Co.,* 263 U.S. 413, 416, 44 S.Ct. 149, 68 L.Ed. 362 (1923).

While the *Rooker–Feldman* doctrine recognizes that the federal district courts may not review decisions by a state's courts, it does not preclude federal district court review of "executive action, including determinations made by a state administrative agency." *Verizon Maryland,* 535 U.S. at 644 n. 3, 122 S.Ct. 1753. This principle holds true even where the administrative agency acted in an adjudicative capacity, *see id.* (*Rooker–Feldman* doctrine did not deprive district court of jurisdiction to entertain challenge to state public service commission's order resolving a contract dispute between competing providers of telecommunications services), or where the plaintiff could have sought, but did not seek, review of the agency's determination in a state court, *see, e.g.,·Hachamovitch v. DeBuono,* 159 F.3d 687, 695 (2d Cir.1998). *See generally* 18B C. Wright, A.·Miller & E. Cooper, *Federal Practice and Procedure* § 4469.1, at 143–44 (2d ed. 2002) ("[T]he [*Rooker–Feldman* ] bar ... may be applied if a state court has reviewed an administrative order. But federal jurisdiction is not ousted by the in-

volvement of an unreviewed administrative order . . . ." (footnotes omitted)).

The *Verizon Maryland* principle, *i.e.,* that *Rooker–Feldman* does not preclude district court review of "executive . . . determinations made by a state administrative agency," 535 U.S. at 644 n. 3, 122 S.Ct. 1753, may not extend to agencies that are appropriately characterized as arms of the state judiciary *qua* judiciary, either because they exercise powers that are inherent to the judiciary, or because the state has provided mechanisms for judicial review of their determinations that distinguish those determinations from other types of state administrative action. In *Thomas v. Kadish,* 748 F.2d 276 (5th Cir. 1984), *cert. denied,* 473 U.S. 907, 105 S.Ct. 3531, 87 L.Ed.2d 655 (1985), for example, the Fifth Circuit dealt with a decision of the Texas Board of Law Examiners ("Board"), a body composed of attorneys appointed by the state supreme court, denying the plaintiff's application for admission to the Texas bar. *See id.* at 277–78, 281. The Fifth Circuit ruled that the *Rooker–Feldman* doctrine barred federal district court review of the Board's decision, reasoning that the state supreme court had inherent power over attorneys' admission to practice law in the state and that it had delegated that power to the Board. *See Thomas v. Kadish,* 748 F.2d at 282. Further noting that the state supreme court "itself [had] provided for a method of judicial review of the Board's denial of fitness," the Fifth Circuit concluded that the Board's proceeding " 'may be analogized to the function of a special master' in taking actions of an 'essentially judicial nature.' " *Id.* (quoting *Middlesex County Ethics Committee v. Garden State Bar Ass'n,* 457 U.S. 423, 434 n. 13, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982)). That type of decision is no more subject to review by a federal district court than would be the final decision of the state supreme court. *See Thomas v. Kadish,* 748 F.2d at 282.

Along similar lines, the Fourth Circuit in *Allstate Insurance Co. v. West Virginia State Bar,* 233 F.3d 813 (4th Cir.2000) ("*Allstate* "), ruled that the *Rooker–Feldman* doctrine barred district court review of the determination by a state bar committee that an insurance company had engaged in the unauthorized practice of law. *See id.* at 818. That committee was an arm of West Virginia's judicial branch, as it was, by state law,

> an "agency of the [S]upreme [C]ourt of [A]ppeals of West Virginia[,]" [whose] purpose is to "give effect to pertinent rules of the [S]upreme [C]ourt of [A]ppeals." See W.Va. State Bar Constitution, arts. I, II. The State Bar is "a part of the judicial department of the State government . . . created for the purpose of enforcing such rules as may be prescribed, adopted and promulgated by the court." W.Va.Code § 51–1–4a(d). See also *Daily Gazette Co. v. Comm. on Legal Ethics,* 174 W.Va. 359, 326 S.E.2d 705, 708 (1984) (deciding that "the West Virginia State Bar is an agency of the Supreme Court of Appeals, and not an independent agency").

*Allstate,* 233 F.3d at 817–18. The Fourth Circuit noted that the West Virginia Supreme Court of Appeals had "exclusive authority to regulate and control the practice of law and . . . inherent power to supplement rules" of practice, including those that defined the unauthorized practice of law, *id.* at 818, and that the committee proceedings in question were of a judicial character, in that the committee had, *inter alia,* received a complaint that the respondent insurance company, in distributing a certain pamphlet, was engaging in the unauthorized practice of law; investigated that complaint; appointed a subcommittee (composed of two practicing attor-

neys and a judge of a court of general jurisdiction) to convene a hearing to receive arguments and examine exhibits; analyzed the facts underlying the complaint in light of the state-bar definition of unlawful practice of law and various state-court precedents involving conduct alleged to constitute such practice; and rendered a written opinion concluding that the respondent's actions "constituted the unlawful practice of law as defined by the West Virginia Supreme Court of Appeals," *id.* at 817. No state court had reviewed the committee's decision, but the West Virginia regulatory scheme required judicial review before any coercive action could be taken. Accordingly, the Fourth Circuit reasoned that the committee's decision and state-court review were each "steps" in a unitary judicial proceeding and concluded that the committee's decision was akin to an interlocutory state-court decision that could not, consistent with the *Rooker–Feldman* doctrine, be reviewed by a federal district court. *Id.* at 819.

The mere fact that agency officials were appointed by a state court, as in *Thomas v. Kadish,* does not mean that the agency acts as a court. In *Roudebush v. Hartke,* 405 U.S. 15, 92 S.Ct. 804, 31 L.Ed.2d 1 (1972), for example, the Supreme Court ruled that, with respect to an election for the United States Senate, a three-judge federal district court had jurisdiction to enjoin action by a commission that had been appointed by a state court to conduct a vote recount. *See id.* at 20–22, 92 S.Ct. 804. The *Roudebush* Court concluded that 28 U.S.C. § 2283, which generally prohibits a federal court from "grant[ing] an injunction to stay proceedings in a State court," was inapplicable because, *inter alia,* the state court's appointment of the commission, which was required if that court found that the recount petition was in proper form, was not performed in a

"proceeding" that was "judicial." 405 U.S. at 21, 92 S.Ct. 804.

In *Feldman,* the Court likewise observed that, even where the challenged decision is one by a state entity that could properly be characterized as a court, what determines reviewability by a federal district court is not the " 'character of the body' " but rather the " 'character of the proceedings.' " 460 U.S. at 477, 103 S.Ct. 1303 (quoting *Prentis v. Atlantic Coast Line Co.,* 211 U.S. 210, 226, 29 S.Ct. 67, 53 L.Ed. 150 (1908), and citing, *inter alia, Roudebush,* 405 U.S. at 20–22, 92 S.Ct. 804). The *Rooker–Feldman* doctrine bars federal district court review only of state-court decisions that are judicial in "nature and effect." *Feldman,* 460 U.S. at 478, 103 S.Ct. 1303 (internal quotation marks omitted). It does not bar such review of an agency or committee decision that is in effect legislative or administrative. A decision is judicial when it declares "rights as they stand"; a decision is of a legislative character when it makes a declaration instead "on rights which may arise in the future," *id.* (internal quotation marks omitted), "making a new rule to be applied thereafter to all *or some part* of those subject to its power," *id.* at 477, 103 S.Ct. 1303 (internal quotation marks omitted) (emphasis ours). For a decision to be judicial, there must be a ruling on "an actual controversy over an issue, not . . . an abstract declaration of the law." *Id.* at 478, 103 S.Ct. 1303 (internal quotation marks omitted).

 In the present case, we conclude that the *Rooker–Feldman* doctrine is inapplicable both because the Screening Committee, in compiling a list of qualified attorneys, acts as an administrative body, rather than conducting proceedings that are judicial, and because its denial of Mitchell's application for recertification to

the 18–B Panel was a decision that was not judicial but legislative.

### 1. *The Role of the Screening Committee*

█ We conclude that the Committee does not act as a judicial arm of the Appellate Division for several reasons. First, although the State Defendants have argued that "the actions of the screening committee .... are essential to permitting judges ... to appoint counsel" (Hearing Transcript, January 17, 2002, at 9–10), the power of a New York court to appoint counsel to represent an indigent defendant is not dependent even on the existence of an 18–B Panel, much less on the Committee's certification of attorneys to that panel. The court has inherent power—indeed, it has a constitutional obligation in a criminal prosecution—to appoint an attorney for an indigent defendant. *See, e.g., In re Smiley,* 36 N.Y.2d 433, 437–38, 369 N.Y.S.2d 87, 90–91, 330 N.E.2d 53 (1975) (no similar obligation in a matrimonial case); *Stream v. Beisheim,* 34 A.D.2d 329, 333, 311 N.Y.S.2d 542, 547 (2d Dep't 1970) (per curiam) ("There has been no time in the governmental history of this state when the court lacked the power to assign counsel for the defense of indigent persons charged with crime ...."). Thus, the court is free to appoint an attorney who has not been certified to the 18–B Panel:

Under no circumstances can section 722 of the County Law be deemed to inhibit or override the trial court's exercise of its inherent power or the performance of its constitutional or statutory duty to furnish proper counsel to an indigent defendant....

It should be emphasized that article 18–B (§§ 722–722–f) of the County Law ... is merely cumulative. [It is] ... designed to facilitate and implement the court's exercise of its inherent power.

[It] serve[s] to provide a constant, ready source of available counsel; to define the amount and source of their compensation, and the manner of payment. But [it] do[es] not and cannot entrench upon the court's inherent power and fundamental duty to provide counsel to an indigent defendant.

*Stream v. Beisheim,* 34 A.D.2d at 333–34, 311 N.Y.S.2d at 547 (internal quotation marks omitted). The Committee's decisions, therefore, neither are essential to nor in any way circumscribe the court's exercise of its inherent authority.

Second, the Committee does not determine which attorney will be appointed in any given case. The courts' inherent power of appointment has not been delegated to the Committee.

Third, the New York courts do not have inherent authority to provide that an attorney so appointed will be compensated. Rather, an attorney admitted to practice law in New York has a "duty ... to provide *uncompensated* services for the indigent." *In re Smiley,* 36 N.Y.2d at 438, 369 N.Y.S.2d at 91, 330 N.E.2d 53 (emphasis added).

[T]he cases establishing the right to assigned counsel in criminal matters c[an-]not be used to mandate compensation by public funding. Even in expanding the criminal right to assigned counsel the courts, Federal and State, never presumed to direct the appropriation and expenditure of public funds.

*The appropriation and provision of authority for the expenditure of public funds is a legislative and not a judicial function,* both in the Nation and in the State. It is correlated, of course, with the taxing power (see N.Y. Const., art XVI, § 1; US Const., art I, § 8, cl 1).

*In re Smiley,* 36 N.Y.2d at 439, 369 N.Y.S.2d at 92, 330 N.E.2d 53 (emphasis added). Because the State Legislature an-

ticipated that the private Bar would not be able to carry the burden of uncompensated representation for the large numbers of indigent defendants facing criminal charges, the Article 18–B "legislation was enacted to provide systematic representation of defendants by assigned counsel *and for their compensation." Id.* at 438, 369 N.Y.S.2d at 91, 330 N.E.2d 53 (emphasis added). Thus, as described in Part I.A. above, the Legislature required municipalities to devise plans for the assignment and compensation of counsel for indigent defendants; and the City, with the approval of the State's Judicial Conference, adopted the Assigned Counsel Plan. The Plan delegates rulemaking authority, for the administration of the Plan, to the Appellate Division, First and Second Departments. And pursuant to this rulemaking grant, the Appellate Division First Department established the Committee "to improve the efficiency of the Assigned Counsel Plan administered by the Court under County Law, Article 18–B." 1979 N.Y. Op. Att'y Gen. at 71. The mere presence of the Appellate Division in this chain does not transmute the obligation imposed by the Legislature on the City into an inherent power of the judiciary. In accordance with the Plan, the Committee assembles 18–B Panels of attorneys who, if appointed by the court to represent an indigent defendant charged with a crime, will be entitled to compensation for their services. A qualified attorney may or may not be on an 18–B Panel. For an attorney appointed to represent an indigent defendant, the difference between being on an 18–B Panel and not being on such a panel is simply the difference between being entitled to publicly funded compensation and not being entitled to such compensation. *See, e.g., People v. Burns,* 28 A.D.2d 1039, 1039, 283 N.Y.S.2d 678, 678 (3d Dep't 1967) (mem.) (denying application for attorney's fee "on the ground that claimant was not assigned pursuant to the provisions of article 18–B of the County Law"). Given that the source of the entitlement to compensation for 18–B Panel members is the Legislature, not the courts, and that assignments of counsel—whether or not from the Panel—are made by the courts, not the Committee, we cannot conclude either that the power exercised by the Committee is judicial or that the Committee is a judicial, rather than an administrative, body.

We note further that, although the State Defendants seem to suggest that they have been appointed by the court (*see* Defendants–Appellees' brief on appeal at 24, 23) (arguing that *Thomas v. Kadish*'s discussion of a " 'state board [that was] appointed by the state supreme court' " "is instructive" (quoting *Thomas v. Kadish,* 748 F.2d at 281)), the Screening Committee member appointments here in fact need not have been made by the court. While the Appellate Division has the exclusive power to extend the term of a member by *re*-appointment, the Appellate Division 18–B Rules provide that a Committee member's initial three-year appointment may be made by *either* the Appellate Division or "the president[ ] of the [bar] association[ ]." N.Y. Comp.Codes R. & Regs. tit. 22, § 612.4.

Nor can the present case be analogized to *Thomas v. Kadish* or *Allstate* on the theory that the Committee's determinations are the equivalent of a special master's recommendations or of a state court's interlocutory decisions that are to be further reviewed by the state courts. Although judicial review of the Screening Committee's determinations is to a limited extent available in a state-court Article 78 proceeding, *see* N.Y. C.P.L.R. § 7801 *et seq.* (McKinney 1994), we are unpersuaded, for two reasons, that the availability of such review provides a basis for deeming

the Committee's decisions to be essentially those of a court.

First, we note that the Appellate Division 18–B Rules contain no provision for review of a Committee decision and that the Committee's bylaws provide that "[t]he action of the Committee is final and non-appealable," Screening Committee Bylaw 2.7. To be sure, that bylaw provision and the silence of the Rules cannot entirely foreclose an Article 78 proceeding, for "[e]ven where judicial review is proscribed by statute," the courts retain jurisdiction in an Article 78 proceeding "to make certain that the administrative official has not acted in excess of the grant of authority given . . . by statute or in disregard of the standard prescribed by the legislature." *New York City Department of Environmental Protection v. New York City Civil Service Commission*, 78 N.Y.2d 318, 323, 574 N.Y.S.2d 664, 666, 579 N.E.2d 1385 (1991) (internal quotation marks omitted); *see, e.g., Bryer v. Family Court Panel Plan*, 205 A.D.2d 406, 613 N.Y.S.2d 609 (1st Dep't 1994) (mem.) (entertaining, but ultimately denying, an Article 78 petition to annul denial of recertification to 18–B Family Court Panel). But the absence of any provision for judicial review in a regulatory scheme tends to negate a key consideration that might otherwise support the view that the agency is acting as a judicial arm of the state court. *Cf. Scott v. Flowers*, 910 F.2d 201, 208–09 (5th Cir. 1990) (*Rooker–Feldman* doctrine did not bar federal district court's consideration of a challenge to a public reprimand issued to a sitting judge by the Texas Commission on Judicial Conduct, where "no appeal from [such] reprimands was available"). And the availability of an Article 78 proceeding, which is "the customary procedural vehicle for review of *administrative* determinations," *Solnick v. Whalen*, 49 N.Y.2d 224, 231, 425 N.Y.S.2d 68, 72, 401 N.E.2d 190 (1980) (emphasis added), does

not serve to distinguish the Committee's decisions from the acts of other state administrative agencies that could not be considered judicial, *see generally* N.Y. C.P.L.R. § 7801 *Practice Commentaries* C7801:1 ("For the most part, Article 78 proceedings are used to challenge action (or inaction) by agencies and officers of state and local government.").

Second, although the State Defendants contend that Mitchell could have asserted his claims of racial discrimination and retaliation in an Article 78 proceeding, that contention is inconsistent with their position that the Committee functions as an arm of the judiciary *qua* judiciary. Article 78 proceedings seeking review of action or inaction by a court, as contrasted with an administrative agency, have been permitted only for petitions seeking review of orders that summarily punished contempts committed in the court's presence, *see* N.Y. C.P.L.R. § 7801(2), and for petitions in the nature of prohibition to restrain a judicial officer from acting without jurisdiction or in excess of jurisdiction, *see Town of Huntington v. New York State Division of Human Rights*, 82 N.Y.2d 783, 786, 604 N.Y.S.2d 541, 542–43, 624 N.E.2d 678 (1993) (mem.), and mandamus to compel a court's performance of a ministerial act, *see Legal Aid Society of Sullivan County, Inc. v. Scheinman*, 53 N.Y.2d 12, 16, 439 N.Y.S.2d 882, 884, 422 N.E.2d 542 (1981). *See generally* N.Y. C.P.L.R. § 7801(2) ("Except where otherwise provided by law, a proceeding under . . . article [78] shall not be used to challenge a determination . . . which was made in a civil action or criminal matter unless it is an order summarily punishing a contempt committed in the presence of the court."); *see, e.g.,* N.Y. C.P.L.R. § 7801 *Practice Commentaries* C7801:3 (the rationale for permitting mandamus review is that "[i]f the challenged matter is the performance

or nonperformance of an official duty in the nature of a ministerial or clerical act, no 'determination' is being reviewed"). Thus, if the decisions of the Committee were to be viewed as judgments of a court, Mitchell's claims would not fit within any of the categories for which Article 78 review is permitted.

We note also that Mitchell's claims, if cognizable in an Article 78 proceeding, could not have been fully adjudicated in that proceeding because in such a proceeding, a plaintiff may normally seek only declaratory or injunctive relief; damages are available only when they are " 'incidental to the primary relief sought.' " *Keane v. New York Law School,* 186 A.D.2d 453, 453, 589 N.Y.S.2d 18, 19 (1st Dep't 1992) (mem.) (quoting N.Y. C.P.L.R. § 7806). Because in the usual civil rights action the damages requested cannot be characterized as incidental, such damages could not be obtained in an Article 78 proceeding. *See generally Kirschner v. Klemons,* 225 F.3d 227, 238–39 (2d Cir.2000); *Parker v. Blauvelt Volunteer Fire Co.,* 93 N.Y.2d 343, 347–49, 690 N.Y.S.2d 478, 481–82, 712 N.E.2d 647 (1999).

In sum, the Screening Committee's members need not have been appointed by the court; the Committee does not exercise any inherent power of the courts; its certifications are not essential to the exercise of any of the courts' inherent powers; its failure to certify a given attorney does not prevent a court from appointing that attorney; and its decisions are not reviewable pursuant to Article 78 as decisions of a court, except to the extent that they may be considered ministerial rather than judicial. The Committee's certification decisions merely indicate who may, pursuant to the State's enabling legislation and the City's Plan, receive compensation for appointments that may be made by the courts in the future. We conclude that the

Committee, in making its certification decisions, is acting as an administrative aide to the court, rather than as a judicial arm of the court.

### 2. The Nature of 18–B Panel Certification Decisions

■ We also conclude that the *Rooker–Feldman* doctrine does not bar review of the Committee's denial of Mitchell's application for recertification because that decision was, in its effect, legislative rather than judicial. Under *Feldman,* a decision is not "judicial" in nature unless it is a ruling on "an actual controversy over an issue, not ... an abstract declaration," 460 U.S. at 478, 103 S.Ct. 1303 (internal quotation marks omitted), as to a new rule to be applied in the future, *see id.* at 479, 103 S.Ct. 1303. Although "[a] claim of a present right to admission to the bar of a state and a denial of that right is a controversy," *id.* (internal quotation marks omitted), we do not view an application for certification or recertification to an 18–B Panel as initiating such a controversy. A decision with respect to an applicant's present right to admission to the bar has the immediate effect of granting or denying his right to practice law. Certification to an 18–B Panel has no such effect, either qualitatively or temporally. An attorney may practice law whether or not he is on such a panel; and whether or not he is a member of such a panel, he may be appointed to represent an indigent defendant. Further, as discussed above, being on such a panel does not necessarily mean that the attorney will immediately—or perhaps ever—be appointed to represent an indigent defendant; it means merely that he will be entitled to receive compensation for his services out of public funds if and when he is appointed to represent an indigent defendant. Accordingly, a decision on 18–B Panel certification normally makes no declaration of rights as they stand but only of

rights that may arise in the future, and hence is not a decision that, under the *Rooker–Feldman* doctrine, may properly be characterized as judicial.

In the present case, the Committee did not declare that Mitchell was unqualified to act as counsel for indigent defendants; nor did it indicate that there had been any complaint as to his performance or that any question had been raised as to his fitness or competence to act in that capacity. Quite to the contrary, the Committee "express[ed its] appreciation" to Mitchell for his "years of service to the indigent accused," and stated that he was "expected to continue to handle to conclusion any assigned cases [he then had]." (Committee Letter to Mitchell.) Thus, in terminating Mitchell's 18–B certification, the Committee merely made a declaration as to his right to receive publicly funded compensation for his services in cases to which he might be assigned in the future. This was not a declaration of any existing right or liability. Indeed, in urging the dismissal of Mitchell's Complaint, the State Defendants argued, *inter alia,* that Mitchell's request for declaratory relief from the Committee's decision sought merely an "advisory opinion[ ] that ... cannot affect the rights of litigants in the [present] case." (May Tr. at 13.) We conclude that the Committee's decision was legislative, not judicial.

In sum, we conclude, for the reasons stated in this section and in Part II.A.1. above, that the Committee's decisions implement the legislative resolution that attorneys certified to an 18–B Panel and appointed by the court to represent indigent defendants are to receive compensation, that the Committee's status is that of an administrative body rather than a judicial tribunal, that its certification decisions are not judicial decisions, and, accordingly, that the district court did not lack subject matter jurisdiction under the *Rooker–Feldman* doctrine.

### B. *The State Defendants' Claims of Absolute Immunity*

We also conclude that the district court should have rejected the State Defendants' contention that they were entitled to quasi-judicial absolute immunity on Mitchell's claims against them for damages. A private actor may be afforded the absolute immunity ordinarily accorded judges acting within the scope of their jurisdictions if his role is " 'functionally comparable' to that of a judge," *Butz v. Economou,* 438 U.S. 478, 513, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), or if the private actor's acts are integrally related to an ongoing judicial proceeding, *Scotto v. Almenas,* 143 F.3d 105, 111–12 (2d Cir. 1998); *Dorman v. Higgins,* 821 F.2d 133, 136–38 (2d Cir.1987). We cannot see that the State Defendants fit into either category.

In deciding whether an actor is entitled to absolute immunity on the basis that his role is analogous to that of a judge, we evaluate the challenged proceedings in light of the "characteristics of the judicial process" set forth in *Butz v. Economou. See DiBlasio v. Novello,* 344 F.3d 292, 297–98 (2d Cir.2003), *cert. denied,* — U.S. ——, 124 S.Ct. 2018, 158 L.Ed.2d 492 (2004).

[I]n *Butz* the Court mentioned the following factors, among others, as characteristic of the judicial process and to be considered in determining absolute as contrasted with qualified immunity: [1] the need to assure that the individual can perform his functions without harassment or intimidation; [2] the presence of safeguards that reduce the need for private damages actions as a means of controlling unconstitutional conduct; [3] insulation from political in-

fluence; [4] the importance of precedent; [5] the adversary nature of the process; and [6] the correctability of error on appeal.

*Cleavinger v. Saxner,* 474 U.S. 193, 201–02, 106 S.Ct. 496, 88 L.Ed.2d 507 (1985) (citing *Butz,* 438 U.S. at 512, 98 S.Ct. 2894). Of these six factors, the second, fourth, fifth and sixth are those most peculiar to the functioning of the judicial process—as contrasted with, for example, the prosecutorial function—and none of them suggests that the Screening Committee's proceedings are similar to those of a judicial tribunal. Aside from a rule that an attorney is not to be "denied recertification unless the application has been reviewed by at least five attorneys, with a majority recommending against recertification," Screening Committee *Recertification Procedures* art. V, the State Defendants have not called our attention to any procedural safeguards akin to those in judicial proceedings. For example, they have pointed to nothing that would show that the Committee need abide by precedent, or that there is any separation of its investigative and decisionmaking functions, or any recordation of statements by witnesses or the applicant, or any requirement that the Committee reveal the reasons for its decisions. There is no requirement for a formal hearing; and although the Committee bylaws provide that "[a] panel member who is the subject of a complaint shall receive notice of the substance of the complaint," Screening Committee Bylaw 3.4, Mitchell asserts that he "was removed from the panel without notice of the reasons for his removal and without the opportunity to challenge any accusations lodged against him." (Affirmation of Stephen T. Mitchell dated March 27, 2002, at 9.) Indeed, the State Defendants take the position that an attorney need not be apprised of the details of an accusation against him or even of the identity of his accuser. The State Defendants maintain that "the work of committees like the Screening Committee can be of real assistance only if the sources of its information are kept confidential. Those who respond to the Committee's inquiries can be helpful only if they feel free to say what they know without concern about embarrassment or retaliation.... Consequently, *the extent to which any candidate is advised of the details and the source of information relevant to [attorney] fitness must be left to the discretion of the Committee.*" (Defendants–Appellees' supplemental letter brief on appeal dated February 27, 2004, at 3 (internal quotation marks omitted) (emendations in brief) (emphasis ours).)

In addition, as discussed in Part II.A.1. above, the Rules make no provision for judicial review, and the Committee's own bylaws state that there is no right of appeal, *see* Screening Committee Bylaw 2.7. And although the Committee's determinations may, to an extent, be reviewable in an Article 78 proceeding, "in the context of determining whether absolute immunity is appropriate[ ] Article 78 proceedings are generally not considered adequate avenues for 'appeal.' " *DiBlasio v. Novello,* 344 F.3d at 299; *see, e.g., Young v. Selsky,* 41 F.3d 47, 54 (2d Cir.1994), *cert. denied,* 514 U.S. 1102, 115 S.Ct. 1837, 131 L.Ed.2d 756 (1995).

Given the unavailability of an adequate avenue for judicial review, along with the lack of any requirement for a formal hearing, and the Committee's claimed unfettered discretion to withhold from the attorney the details and source of accusations against him, we think it plain that the Committee's function is not analogous to that of a judge.

■ Nor can we conclude that the State Defendants are entitled to absolute immu-

nity on the ground that the Committee's decisions are "integrally related" to a judicial proceeding. In order to be entitled to absolute immunity under this test, the official must be engaged in acts that are integrally related not simply to the judicial process in general but to a concrete judicial case or controversy. *See generally Supreme Court of Virginia v. Consumers Union of the United States, Inc.,* 446 U.S. 719, 731, 100 S.Ct. 1967, 64 L.Ed.2d 641 (1980). Functions that might be deemed integrally related to the judicial process when undertaken in the context of a particular case may be viewed as administrative when they are undertaken outside that context, and "[a]dministrative decisions, even though they may be essential to the very functioning of the courts, have not ... been regarded as judicial acts," *Forrester v. White,* 484 U.S. 219, 228, 108 S.Ct. 538, 98 L.Ed.2d 555 (1988). For example, a judge has been held to have absolute immunity from a claim of conspiracy to empanel an all-white jury in a particular criminal trial, *see White v. Bloom,* 621 F.2d 276, 279–80 (8th Cir.), *cert. denied,* 449 U.S. 995, 101 S.Ct. 533, 66 L.Ed.2d 292 (1980), but to have no such immunity from a claim of racial discrimination in the preparation of general jury lists to affect all future trials, a job that was "ministerial," *see Ex parte Virginia,* 100 U.S. (10 Otto) 339, 348, 25 L.Ed. 676 (1879). In the latter case, the judge had the responsibility of "prepar[ing] annually a list of such inhabitants of the county ... 'as he shall think well qualified to serve as jurors, being persons of sound judgment and free from legal exception,' " *id.* at 349 (Field, J., dissenting), a task that "might as well have been committed to a private person as to one holding the office of a judge," *id.* at 348 (majority opinion).

The Committee's job of formulating a list of attorneys deemed qualified to represent indigent defendants accused of crimes, and its additions to or deletions from that list, bear a marked similarity to the *Ex parte Virginia* judge's responsibility for compiling a list of qualified jurors. The Committee's decisions are not related to any particular criminal prosecution. The 18–B Panel exists so that judges may select attorneys from the list who will both provide future representation to indigent defendants and receive compensation for those services. But, as discussed above, in any given case, the court may appoint an attorney who is not on the 18–B Panel. Further, even the Committee's rejection of Mitchell's individual application did not affect any particular case, for the Committee's letter of rejection stated that Mitchell was to continue to "handle to conclusion" any matter to which he was then assigned. (Committee Letter to Mitchell.)

In sum, the Committee's functions are neither comparable to those of a judge nor integrally related to any specific judicial proceeding. We conclude that the State Defendants are not entitled to quasi-judicial absolute immunity from Mitchell's claims for damages.

By the same token, the provision in § 1983 conditionally prohibiting the granting of injunctive relief against "a judicial officer for an act or omission taken in such officer's judicial capacity," 42 U.S.C. § 1983, is inapplicable to the State Defendants, who plainly are not judicial officers and do not act in a judicial capacity.

## CONCLUSION

We have considered all of the State Defendants' arguments on this appeal and have found them to be without merit. For the reasons discussed above, we vacate so much of the judgment as dismissed Mitchell's claims on grounds of absolute immunity and lack of subject matter jurisdiction,

and we remand for further proceedings not inconsistent with this opinion.